No. 105,809

STATE OF KANSAS, *Appellee*, v. MICHAEL AKINS, JR., *Appellant*.

(315 P.3d 868)

Opinion filed January 10, 2014.

*Daniel E. Monnat*, of Monnat & Spurrier, Chtd., of Wichita, argued the cause and was on the briefs for appellant.

*Natalie Chalmers*, assistant solicitor general, argued the cause and was on the brief for appellee.

The opinion of the court was delivered by

NUSS, C.J.: A jury convicted Michael Akins, Jr., of eight counts of aggravated indecent liberties with a child, one count of attempted aggravated indecent liberties with a child, one count of indecent liberties with a child, one count of aggravated indecent solicitation of a child, three counts of indecent solicitation of a child, and one count of battery. The district court sentenced him to prison for two consecutive hard 25 life sentences plus 59 months. Akins appeals his convictions and sentences. Our jurisdiction of his appeal is under K.S.A. 22-3601(b).

The issues on appeal, and our accompanying holdings, are as follows:

1. Did the prosecutor commit reversible misconduct? Yes.
2. Did the district court err by excluding testimony about prior false allegations of sexual abuse on the basis the proffered witnesses were related to Akins? Yes.
3. Did the district court err by failing to use written unanimity jury instructions for the charges? Moot.
4. Did the district court err by failing to comply with the jury-polling statute, K.S.A. 22-3421? Moot.
5. Did cumulative error deny Akins a fair trial? Moot.

6. Are Akins' sentences unconstitutionally disproportional to the crimes charged? Moot.

Accordingly, we reverse and remand for a new trial.

## FACTS

Defendant Michael Akins, Jr., married Jennifer B. in April 2008. Jennifer had six children from a previous marriage: daughters, M, L, J, K, and N, and one son, E. Akins, Jennifer, and the children lived together at Akins' home in Inman, Kansas. At all relevant times, Akins was the police chief of Inman, and Jennifer worked for the McPherson County Attorney's office. Their marriage was short-lived, with the couple separating on December 18, 2009.

Approximately 2 weeks later, Jennifer asked her oldest daughter, M, whether Akins had ever done anything inappropriate to her. M replied that Akins had touched her inappropriately and described the incidents while Jennifer took notes. Jennifer told her next three oldest children, E, L, and J, that Akins had done inappropriate things to M and asked if he had done likewise to them. All three replied that he had also touched them inappropriately. Jennifer took notes of her conversations with L and J, but E prepared his own notes about the incidents.

Jennifer reported her children's allegations to her supervisor at the McPherson County Attorney's office, who then asked the Kansas Bureau of Investigation (KBI) to investigate. As a part of the resulting KBI investigation, M, E, L, and J were all interviewed about their allegations. M and E were interviewed by Kelly Robbins, the executive director of the Western Kansas Child Advocacy Center and Finding Words of Kansas. L and J were interviewed by Wilma Mueller, an investigative social worker at Kansas Social and Rehabilitation Services in Newton, Kansas. Both interviewers were trained in the "Finding Words" protocol for interviewing children in cases of suspected sexual abuse.

Based on the children's allegations and their interviews, the State charged Akins with 21 counts of various crimes. Each count was based on incidents that allegedly occurred between May 15 and December 18, 2009, the date of the couple's separation.

Regarding M, the State charged Akins with nine counts of aggravated indecent liberties, one count of indecent liberties, and three counts of indecent solicitation of a child. As to E, it charged Akins with two counts of battery, one count of aggravated indecent liberties, and one count of lewd and lascivious behavior. For L, it charged Akins with two counts of aggravated indecent solicitation and one count of aggravated indecent liberties. And as to J, it charged Akins with one count of aggravated indecent liberties.

Each child testified at trial about encounters with Akins. M testified that Akins had entered her bedroom and touched her vagina, fondled her vagina in a car, penetrated her vagina with his fingers, fondled and sucked on her breasts, asked her to pull on his penis, had her pull on his penis, asked her if she wanted to put his penis in her mouth, and asked if he could perform oral sex on her. M also testified that Akins would enter the bathroom while she was showering and comment on her breasts. She said he sent her more text messages than any other person and sent her flowers several times.

According to M, Akins sometimes woke her in the morning by sitting in bed with her and saying "good morning, wifey." She testified further that Akins had her shave his back while he was wearing only his underwear. M also stated that Akins also had her younger sisters shave his back. Finally, she testified Akins once asked her if she wondered what a French kiss would be like and later kissed her, licking around her lips. M was 14 years old when the alleged incidents occurred.

L testified that Akins asked to see her chest but that she initially refused. When Akins persisted, she eventually relented. She also said Akins made her shower with her younger sister, J, to save water. According to L, Akins opened the shower curtain while she and J were showering and touched her nipples and buttocks. L also testified she saw Akins repeat this behavior with J. L further said Akins sometimes rubbed her chest with his hand inside her pajamas while making an "mmm, mmm" noise. L was 9 or 10 years old during these alleged incidents.

J testified that Akins used his hand to touch her chest, vagina, and buttocks outside her clothes. Sometimes this would occur

while wrestling with Akins and the other children. According to J, Akins would enter the bathroom while she and L were in the shower, and, without saying anything, reach around the shower curtain to pinch her chest or buttocks. J was 7 or 8 years old during these alleged incidents.

E testified Akins used to grab his sisters' hands and use them to hit E's crotch. He said one night when Akins was mad about something he grabbed E's crotch and said, "You better watch your balls, boy." And on another occasion, Akins grabbed E's penis over E's boxers and said, "You better watch your penis." E testified Akins would grab E's hand, place it on Akins' crotch, and say, "You're violating me."

As to Akins' behavior toward E's sisters, E testified that he witnessed Akins touching L and J on the chest and that he heard Akins tell L, "Wow, you're getting chesty." He said he once saw Akins put his hand down L's pants after he came in from the cold, saying, "Isn't that cold?" Finally, E testified that on at least five occasions Akins entered the living room after taking a shower, removed his towel, and swung his penis around while saying "helicopter." E was 12 or 13 years old during these alleged incidents.

After the children's testimony, the State presented testimony from Robbins and Mueller and published to the jury video recordings of their interviews with the children. The interviews were generally consistent with the handwritten notes from Jennifer's initial inquiries and the children's trial testimony. But trial was the first time M alleged that Akins asked to perform oral sex on her.

During Akins' case-in-chief, he presented testimony from psychologist Kathie Nichols. She testified generally about suggestibility. According to Nichols, suggestibility is a theory that indicates some children will incorporate outside information into their recollection of events. The outside information often comes from overheard conversations or inartful questioning. She specifically criticized the Finding Words protocol used by Robbins and Mueller in comparison to other interview techniques. Nichols identified characteristics of their interviews that indicated the children might have incorporated "suggested" information into their recollection of events.

Akins also testified in his own defense. Akins denied touching any of the children "in a sexual way" or having any sexual contact with them. He also denied pinching any of the girls' nipples or fondling their breasts or upper chests. Finally, he denied touching M's genitals or breasts, and he specifically denied M's allegation that he fondled her in the car. Akins admitted that Jennifer's daughters had helped shave his back at his request and that he wore his underwear when they shaved him.

After 2 days of deliberations in January 2011, the jury found Akins guilty on 15 of the 19 counts submitted. As to M, it convicted on six counts of aggravated indecent liberties, one count on the lesser included offense of attempted aggravated indecent liberties, one count of indecent liberties, and three counts of indecent solicitation of a child. As to E, the jury convicted on one count of battery. Regarding L, it convicted on one count of aggravated indecent liberties and one count of aggravated indecent solicitation. Finally, as to J, it convicted on one count of aggravated indecent liberties. Akins' four acquittals included one count of aggravated indecent liberties regarding M and one count each of aggravated indecent liberties, battery, and lewd and lascivious behavior regarding her brother E.

The district court sentenced Akins to two consecutive hard 25 life sentences under Jessica's Law, K.S.A. 2010 Supp. 21-4643, for the two aggravated indecent liberties convictions involving J and L. It also sentenced Akins to 59 months' imprisonment consecutive to the life sentences for one aggravated indecent liberties conviction involving M. It further imposed concurrent prison terms ranging from 6 to 63 months for the 12 remaining offenses and ordered lifetime postrelease supervision. Akins appealed.

More facts will be added as necessary to the analysis.

## ANALYSIS

Issue 1: *The prosecutor committed reversible misconduct.*

Akins argues that the prosecutor, Assistant Attorney General Christine Ladner, committed reversible misconduct in three separate instances. The State responds that two of the instances are

not prosecutorial misconduct. While it concedes that the remaining one was misconduct, it contends the error was harmless.

*Standard of review*

We have said that review of prosecutorial misconduct claims involves a two-step process. We first decide whether the comments were outside the wide latitude a prosecutor is allowed, *e.g.*, in discussing the evidence. If so, there was misconduct. Second, if misconduct is found, we have said the court "must determine whether the improper comments prejudiced the jury and denied the defendant a fair trial." *State v. Bridges*, 297 Kan. 989, 1012, 306 P.3d 244 (2013) (citing *State v. Marshall*, 294 Kan. 850, 856, 281 P.3d 1112 [2012]).

For years we have considered several factors in analyzing this second step: (1) whether the misconduct was gross and flagrant; (2) whether it was motivated by prosecutorial ill will; and (3) whether the evidence was of such a direct and overwhelming nature that the misconduct would likely have had little weight in the minds of jurors. No single factor controls the outcome of this inquiry. *Bridges*, 297 Kan. at 1012 (citing *Marshall*, 294 Kan. at 857).

Since 2004, this court has also demanded that any prosecutorial misconduct meet the "dual standard" of both constitutional harmlessness and statutory harmlessness before we will uphold the conviction. See *Bridges*, 297 Kan. at 1012; *State v. Tosh*, 278 Kan. 83, 97, 91 P.3d 1204 (2004) ("Before the third factor can ever override the first two factors, an appellate court must be able to say that both the K.S.A. 60-261 and the *Chapman* [*v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705, *reh. denied* 386 U.S. 987 (1967)] harmlessness tests have been met.").

Under *Chapman*'s constitutional harmless error analysis,

"the error may be declared harmless where the party benefitting from the error proves beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, *i.e.*, where there is no reasonable possibility that the error contributed to the verdict." *State v. Ward*, 292 Kan. 541, Syl. ¶ 6, 256 P.3d 801 (2011), *cert. denied* 132 S. Ct. 1594 (2012).

As to the harmless error analysis defined in K.S.A. 60-261, the test is equally clear. We " 'determine if there is a reasonable prob-

ability that the error did or will affect the outcome of the trial in light of the entire record.'" *State v. Friday*, 297 Kan. 1023, 306 P.3d 265, 273 (2013) (quoting *Ward*, 292 Kan. 541, Syl. ¶ 6).

Both standards require the party benefiting from the error—the State in cases of prosecutorial misconduct—to demonstrate harmlessness. *State v. Herbel*, 296 Kan. 1101, 1110, 299 P.3d 292 (2013). The State bears a higher burden to demonstrate harmlessness when the error is of constitutional magnitude. *Bridges*, 297 Kan. at 1013 (citing *Herbel*, 296 Kan. at 1110 ["Clearly, the party benefitting from the constitutional error must meet a higher standard to show harmlessness than the standard required in nonconstitutional error."]).

*Discussion*

Akins particularly complains that prosecutor Ladner committed misconduct by (1) improperly cross-examining an expert witness for the defense; (2) introducing the concept of "grooming" without evidentiary support and misstating the law by arguing that grooming could establish Akins' sexual intent; and (3) vouching for the credibility of the State's witnesses while openly opining about Akins' untruthfulness. He claims that the comments were gross and flagrant and demonstrated ill will. We will address each claim of misconduct in turn.

*Cross-examination of the defense's expert witness*

As a defense expert witness, psychologist Nichols testified about the suggestibility of children. She specifically criticized the suggestibility she believed was contained in the Finding Words protocol used by Robbins and Mueller to interview the alleged victims of Akins' sexual abuse. During recross-examination of Nichols, she and the prosecutor had the following exchange:

"Q. [Prosecutor]: You used the term gold standard. Of the 7 to 28 states who have affirmed Finding Words, were you aware that Finding Words has been called gold standard?

"[Defense counsel]: I object. Counsel is testifying.

"[Prosecutor]: This is cross-examination. The question is were you aware.

"The Court: Overrule. Go ahead.

"Q. [Prosecutor]: You may answer.

"A. [Nichols]: No, I was not aware that someone called it that.
"[Prosecutor]: The case is *Mooneyham versus State*. Thank you very much."

Akins' counsel did not further object, and the court dismissed Nichols from the witness stand following the prosecutor's last statement.

Akins argues that the prosecutor's comments constitute unsworn testimony to three facts not in evidence: (1) that the Finding Words protocol is the "gold standard"; (2) that a court of law called the Finding Words protocol the gold standard; and (3) that the prosecutor knows more about the Finding Words protocol than expert witness Nichols.

In the State's brief, it contended this was an evidentiary issue unpreserved for appeal. But at oral argument before this court, the State conceded that the statements were misconduct and never should have been made.

We readily agree with the State's concession. Listing but several of the numerous reasons will suffice for our purposes. First, in identifying the Finding Words protocol as the gold standard, the prosecutor was improperly referring to facts that were never in evidence. This prohibition applies to all lawyers, but especially prosecutors. See *State v. McCaslin*, 291 Kan. 697, 719, 245 P.3d 1030 (2011); *Tosh*, 278 Kan. at 88; see also Rule 3.4(e) of Kansas Rules of Professional Conduct (KRPC) (2013 Kan. Ct. Annot. 601) ("A lawyer shall not . . . [e] in trial, allude to any matter that . . . will not be supported by admissible evidence."). And where a prosecutor refers to facts not in evidence, the first prong of the prosecutorial misconduct test is met. *State v. Simmons*, 292 Kan. 406, 414, 254 P.3d 97 (2011).

Second, mentioning a court case as supporting authority in the jury's presence essentially implies that this aspect of the prosecutor's case against Akins already had judicial approval. More specifically, it improperly implies that a court had conclusively established that the Finding Words protocol was not only the "gold standard" but was also therefore unassailable. See *In re Care and Treatment of Foster*, 280 Kan. 845, Syl. ¶ 4, 127 P.3d 277 (2006) ("It is improper and misconduct for counsel to argue that his or her case or some aspect of it has judicial approval.").

The prosecutor's citation of the purported authoritative decision—*Mooneyham v. State*, 915 So. 2d 1102 (Miss. App. 2005)—is additionally troubling because the "gold standard" reference does not appear in the majority opinion. And as Akins accurately observes, the Mississippi Court of Appeals judge authoring this concurring opinion merely noted that the Finding Words protocol has been called the gold standard in North Carolina "practice notes"—documents that the judge did not describe by author, publisher, or date. See 915 So. 2d at 1108..

Additionally, the prosecutor's comments, together with her citation to *Mooneyham* as support, improperly implied she was an authority on the Finding Words protocol. In other words, in contrast to the apparently uninformed defense expert witness being cross-examined, the prosecutor showed the jury she knew about the court opinion and its alleged authoritative declaration of the "gold standard." *Cf. Simmons*, 292 Kan. at 414 ("More regrettably, the prosecutor's overall comments implied he was an authority on the Stockholm syndrome and was capable of diagnosing an individual as suffering from this purported condition. He clearly was neither.").

Misconduct is established.

*Introduction of the "grooming" concept and related arguments*

Akins next argues that the prosecutor committed misconduct by improperly discussing his alleged grooming of the complainants for future sexual abuse. During her opening statement to the jury, the prosecutor introduced the grooming concept:

"[T]he theory of Count 1 is that he came into [M's] room after she was 14. That summer had the *grooming* thing, hugging, watching her and grabbing her by the breast . . . ." (Emphasis added.)

The prosecutor continued this grooming theme in her opening statement by describing Akins' conduct as follows:

"The *grooming* continues, watching her.

. . . .

"[There were t]hese *grooming* things, making the little girls shave his body at first getting on the toilet, doing his back with the electric razor." (Emphasis added.)

The prosecutor concluded her opening statement by revisiting the grooming concept:

"At the close of the case, folks, I will ask in the aftermath that you find him guilty of these counts. That there's evidence of such power, control, his access, his *grooming*, the credibility, the corroboration, similarities and differences between the children, compare his private face to his public face, . . . I will ask that you find him guilty . . . ." (Emphasis added.)

In her closing argument, the prosecutor returned to the theme of Akins' grooming the complainants for sexual abuse. When addressing the particular issue of Akins' intent, she stated:

"Intent. In the jury instructions you get a law on that. A person intends the ordinary consequences of their willful acts. In some of these counts there is language was this done with sexual intent, with the intent to arouse or satisfy the sexual desires. What inference, folks, do you draw from his statements in getting into bed with [M] in the morning calling her wifey and cuddling, pinching the little girls on the nipples and [L] saying mm, mm, mm, asking [L] is [M] on her period? What inference do you draw? Is it a fair inference on these facts that he wanted to know when he could get access to that? *The sexual intent comes from his grooming them*, where on their bodies he was touching, jealousy like a boyfriend, how he touched them, the demonstration of the girls, the rubbing and fondling. There is where you get sexual intent applying the facts to the law." (Emphasis added.)

Akins specifically contends that the State never introduced evidence about grooming, so the concept was introduced without a sufficient evidentiary basis. Akins further argues that, as used by the prosecutor, "grooming" is a psychological term requiring expert testimony. But instead of the prosecutor relying on an expert for diagnosis, reversible error occurred when she essentially made the "grooming diagnosis" herself. Finally, he contends that the prosecutor committed misconduct by misstating the law during closing argument when she argued the jury could rely on grooming to establish Akins' alleged sexual intent.

The State denies that the prosecutor's comments constituted misconduct. It distinguishes *Simmons* and *State v. Chanthaseng*, 293 Kan. 140, 293 P.3d 889 (2011), where we found prosecutorial misconduct based on similar statements involving the Stockholm syndrome and sexual abuse victims' process of disclosure. The State alleges that the *Simmons* prosecutor actually attempted to diagnose

the victim with Stockholm syndrome and that the *Chanthaseng* prosecutor suggested the disclosure of abuse by the victims in that case was typical of sexual abuse victims in general. The State contends that, in contrast, Akins' prosecutor merely used "grooming" in its ordinary sense, and the jury would not have understood it as having a special meaning. So the State argues that no testimony, expert or otherwise, was required to define the term.

The State also disagrees that its use of grooming during closing argument in discussing Akins' sexual intent was erroneous. Although the State referenced grooming as indicative of intent, it argues that the prosecutor was only arguing for a permissible inference from the evidence. It contends it presented sufficient evidence to support a reasonable inference that Akins acted to desensitize his victims to his sexual advances, so it was permissible to use "grooming" to describe his behavior.

Under the first step of our misconduct analysis we decide whether the prosecutor's comments were outside the wide latitude a prosecutor is allowed. *Bridges*, 297 Kan. at 1012. We reject the State's argument that Akins' prosecutor was merely using the word "grooming" as it is commonly understood. And because she introduced this particular concept of grooming without any evidence, her comments necessarily went beyond the latitude allowed in discussing the evidence.

Grooming is a well-known phenomenon in the context of sexual abuse. We dealt with the subject in *State v. Raskie*, 293 Kan. 906, 269 P.3d 1268 (2012). But we did not squarely address whether introducing grooming evidence required expert testimony. Our *Raskie* discussion, however, is consistent with the approaches of other jurisdictions that recognize grooming is a concept that has specific meaning in the context of sexual abuse. 293 Kan. at 918. And grooming evidence typically requires expert testimony. See, *e.g.*, *State v. Berosik*, 352 Mont. 16, 23, 214 P.3d 776 (2009) (permitting expert testimony about grooming); *State v. Sorabella*, 277 Conn. 155, 211-14, 891 A.2d 897 (2006) (same); see also *Morris v. State*, 361 S.W.3d 649, 659-62 (Tex. Crim. App. 2011) (holding that the phenomenon of grooming children for sexual molestation is an appropriate topic for expert testimony and noting that 10

circuits and 38 states have addressed grooming, with most reaching the same conclusion).

Here, the prosecutor used "grooming" repeatedly and in the same context it would have been used had the State sought to introduce the psychological concept through an expert witness. While the State is correct that Akins' prosecutor did not explicitly purport to make a diagnosis of grooming, the prosecutor in *Simmons* did not explicitly purport to diagnose the victim with Stockholm syndrome. But as previously noted, that prosecutor "implied he was an authority on the Stockholm syndrome and was capable of diagnosing an individual suffering from [the] purported condition." 292 Kan. at 414. We held that he was clearly neither and that his comments on the condition were improper because he was asserting personal knowledge of the evidence and arguing facts not in evidence. 292 Kan. at 414. The same essentially can be said in Akins' case.

Likewise, while the State is correct that the prosecutor never explicitly asserted that grooming is typical in sexual abuse cases, this absence does not necessarily mean she intended to use grooming in its everyday sense. We observe she repeatedly argued that Akins groomed the alleged victims in preparation for acts of sexual abuse. And because grooming is a well-known phenomenon in sexual abuse cases, the jury could reasonably infer that the prosecutor was referring to the psychological concept of grooming. Accordingly, the prosecutor's argument required supporting evidence; without it, the prosecutor was arguing facts not in evidence.

As noted, we have consistently found prosecutorial misconduct when a prosecutor argues facts that are not in evidence. See, *e.g., Bridges*, 297 at 1014; see also Gershman, Prosecutorial Misconduct § 11:32, p. 533 (2d ed. 2012) ("By going beyond the record, the prosecutor becomes an unsworn witness, engages in extraneous and irrelevant argument, diverts the jury from its proper function, and seriously threatens the defendant's right to a fair trial."). This prosecutorial practice is troubling "because of jurors' tendency to overvalue what is effectively unsworn testimony by a highly regarded prosecutor, despite the information's worthlessness as a matter of law." *Chanthaseng*, 293 Kan. at 147.

As for the prosecutor's accompanying argument that Akins' earlier alleged grooming also satisfies the essential element of sexual intent at the time of the alleged criminal conduct, we conclude it constituted misconduct. We have held that the prosecutor's wide latitude in discussing the evidence is qualified by an obligation to accurately state the law. *Raskie*, 293 Kan. at 917. Here, the prosecutor's closing argument was a misstatement of the law. Except for battery, the crimes for which the jury convicted him are specific intent crimes. See *State v. Brown*, 291 Kan. 646, 654-56, 244 P.3d 267 (2011) (holding that attempt, aggravated indecent liberties, and aggravated indecent solicitation are specific intent crimes); *State v. Dotson*, 256 Kan. 406, 413, 886 P.2d 356 (1994) (noting that indecent liberties is a specific intent crime). We have held that the specific intent required by a statute must simultaneously be present with the proscribed conduct. *Brown*, 291 Kan. at 654 (citing *State v. Richardson*, 289 Kan. 118, 121, 209 P.3d 696 [2009]) (defining specific intent crimes as those which identify or require a further particular intent which must accompany the prohibited acts). Here, the prosecutor's statement implied that Akins' state of mind during past instances of "grooming" was sufficient to establish the intent required for the crimes he later allegedly committed. But without acknowledging that the intent and conduct must be simultaneously present, it was a misstatement of the law.

### Comments on the credibility of witnesses

Akins' final allegation of misconduct involves prosecutorial comments on the credibility of witnesses: vouching for the credibility of the complainants and opining on Akins' lack of honesty. Specifically, Akins alleges the following statements were impermissible.

In her opening statement, the prosecutor introduced the complainants by saying:

"[M] is the oldest, [E] is the next, boy. They've grown so much over the course of the year since this case came to light.

. . . .

"Jennifer is mild. She is polished. She is articulate. She's well put together. She manages these kids with a calm competence that is amazing."

Akins asserts that these prosecutorial comments showed her inappropriate personal attachment to the complainants. He argues

that the prosecutor then improperly vouched for their credibility during closing arguments:

"Each of these girls with their own take on it, with their own point of view, so no embellishment. *Yes, they are credible.* They are not tainted or they have not been poisoned by the suggestibility that the expert is trying to get you to buy.

. . . .

"[J] is a motor mouth, vomit of information of how many times he was pinching her nipples and where and when and by description, demonstration and by noise. *Yes, that's credible.* Such detail." (Emphasis added.)

Finally, Akins argues that during closing arguments the prosecutor also improperly expressed her personal opinion that his testimony was false.

"The defense said it didn't happen at all. Do you buy that? View the volume of sexual contact and the physical evidence that you have here. Was it just accidental? Was he just messing around . . . and this is all just a strange misunderstanding? *Not a chance on these facts.* His denials. I never touched those kids in a sexual way. *His statements I never touched those kids in a sexual way are not credible.*" (Emphasis added.)

The State denies that these comments constituted prosecutorial misconduct. It notes that the prosecutor repeatedly told the jurors that it was their job to assess the witnesses' credibility, and it concludes that her comments merely offered the jury an explanation of what it should look for in assessing credibility. The State further argues that the prosecutor's comments were properly accompanied by a discussion of the evidence, and the prosecutor was simply pointing out permissible inferences the jury could make from that evidence. See *Chanthaseng*, 293 Kan. at 148 (comments on credibility were not misconduct because "[e]ach was accompanied by a discussion of the evidence," and the prosecutor was "merely asking the jury to draw permissible inferences from that evidence").

We reject the State's arguments. Akins' prosecutor directly, and improperly, expressed her personal opinion on the credibility of her own witnesses. *State v. Pabst*, 268 Kan. 501, 506, 996 P.2d 321 (2000); see also KRPC 3.4(e) (2013 Kan. Ct. R. Annot. 601) ("A lawyer shall not . . . in trial, . . . state a personal opinion as to . . . the credibility of a witness . . . ."). At the outset, the prosecutor introduced the complainants by offering her opinion as to their

maturity and family dynamics. While this alone may not rise to the misconduct level, she worsened its effects and engaged in separate misconduct by giving her personal opinion about the credibility of the three complaining girls, *e.g.*, "Yes, they are credible."

In the context of this particular closing argument, we do not consider this to be a mere contention that based on the evidence presented the jury should infer facts about the girls' credibility. See *State v. Duong*, 292 Kan. 824, 830, 257 P.3d 309 (2011). While the prosecutor arguably makes such a contention regarding J because of "such detail" that J provided, the prosecutor reiterates her opinion about this complainant's veracity with virtually identical, troubling language: "Yes, that's credible." See *Chanthaseng*, 293 Kan. at 148 (citing *State v. Finley*, 273 Kan. 237, 245-46, 42 P.3d 723 [2002]) ("There is a distinction between . . . proper argument and its twin, argument on the prosecutor's personal belief or opinion about a witness's credibility.").

We conclude the prosecutor also committed misconduct by offering her personal opinion about Akins' credibility. We recognize prosecutors have wide latitude during closing argument to point out inconsistencies in a defendant's statements and to argue evidence that reflects poorly on a defendant's credibility. *State v. Elnicki*, 279 Kan. 47, 63, 105 P.3d 1222 (2005). But a prosecutor may not offer her personal opinion that the defendant's testimony was untruthful. *Elnicki*, 279 Kan. at 63-64; see also Prosecutorial Misconduct § 11:27, p. 526 ("Courts caution prosecutors against characterizing testimony as a 'lie' because such categorical and conclusory opinions make the prosecutor an unsworn witness and invade the province of the jury to determine credibility.").

Here, the prosecutor's comments essentially informed the jury that Akins could not be believed. She did not point out inconsistencies in his testimony or argue that specific evidence showed his statements were unworthy of belief. And although she generally referenced the volume of sexual contact and the physical evidence, she also unabashedly opined about his veracity: "His statements I never touched those kids in a sexual way are not credible." See *Chanthaseng*, 293 Kan. at 148.

*Harmlessness analysis*

With the three instances of prosecutorial misconduct established, we turn to the second analytical step of the misconduct inquiry. See *Bridges*, 297 Kan. at 1012 (citing *State v. Marshall*, 294 Kan. 850, 857, 281 P.3d 1112 [2012]). This requires us to determine whether the prosecutor's improper comments were harmless error under the standards of both K.S.A. 60-261 and *Chapman*. *Bridges*, 297 Kan. at 1012.

We have recently held that when the constitutional and nonconstitutional error clearly arise from the same acts or omissions, we logically begin our harmlessness analysis with the constitutional error. *State v. Herbel*, 296 Kan. 1101, 1110, 299 P.3d 292 (2013). We reach this conclusion because if we decide the constitutional error is not harmless and reverse the convictions and sentence, it is unnecessary to determine whether the State met the lower standard for harmlessness under K.S.A. 60-261. 296 Kan. at 1111.

*The misconduct was gross and flagrant.*

In reviewing the factors upon which Akins relies to argue for reversal, we first consider whether the misconduct was gross and flagrant. See *Tosh*, 278 Kan. at 93.

In determining whether prosecutorial misconduct was gross and flagrant, among the things we have considered are whether the comments were repeated, emphasized improper points, were planned or calculated, or violated well-established or unequivocal rules. *State v. Ochs*, 297 Kan. 1094, 1103, 306 P.3d 294 (2013) (citing *State v. Brown*, 295 Kan. 181, 214, 284 P.3d 977 [2012]). We have also considered the long-standing nature of the rule violated. *Brown*, 295 Kan. at 214 (citing *State v. Kemble*, 291 Kan. 109, 121-25, 238 P.3d 251 [2010]).

The State conceded at oral argument that the gold standard comments were gross and flagrant. We agree. Among other things, the rule is well-established that attorneys, especially prosecutors, must not comment on any matter not supported by admissible evidence. See KRPC 3.4(e) (2013 Kan. Ct. Annot. 601); see also *Tosh*, 278 Kan. at 88. And the comments were calculated to emphasize an improper point: that because of a court decision the

prosecutor inappropriately cited to the jury, she knew more about the field than the defense expert psychologist she was cross-examining. *Cf. Foster*, 280 Kan. 845, Syl. ¶ 4 ("It is improper and misconduct for counsel to argue that his or her case or some aspect of it has judicial approval.").

The prosecutor's multiple references to grooming also compel us to decide this particular conduct was gross and flagrant. She mentioned the concept numerous times in her opening and closing arguments. See *Ochs*, 297 Kan. at 1103 (gross and flagrant conduct can exist when conduct repeated).

We also conclude that the prosecutor's comments on the credibility of the witnesses constituted gross and flagrant misconduct. Her credibility opinions broke well-established and long-standing rules regarding the latitude afforded prosecutors in making arguments. See, *e.g.*, *Pabst*, 268 Kan. at 507 (recognizing rules against a prosecutor's improper comments on witness credibility in 2000). Further, these opinions were often repeated. See *Ochs*, 297 Kan. 1094, Syl. ¶ 18.

### *The misconduct was motivated by ill will.*

In determining whether prosecutorial misconduct was motivated by ill will, among the things we have considered is whether the conduct was deliberate or in apparent indifference to a court's ruling. *Marshall*, 294 Kan. at 862; see also Prosecutorial Misconduct § 14:5, pp. 602-03 ("Other factors considered by courts in determining harmfulness are whether the prosecutor's misconduct was deliberate, related to a crucial issue in the trial, or was followed by a prosecutorial apology."); *cf.* Prosecutorial Misconduct § 10:51, p. 458 (a prosecutor's failure to obey court rulings increases the likelihood of reversal). In an overlap with determining gross and flagrant conduct, this court has also considered whether the conduct was repeated when determining whether comments were motivated by ill will. *Ochs*, 297 Kan. 1094, Syl. ¶ 19.

The State concedes that the gold standard comments were motivated by prosecutorial ill will. And we agree. *Cf. Simmons*, 292 Kan. at 418 (among factors supporting ill will were "absolutely no effort to introduce evidence on the" Stockholm syndrome issue,

and prosecutor appeared to make the definition unassailable by openly agreeing with juror's definition). We easily conclude that deliberately giving a jury the impression that a cited judicial opinion is virtually dispositive of the issue—when it is merely a concurring opinion from another jurisdiction that simply cites to "Notes on Use" from yet another jurisdiction—is far below any traditional concepts of good intentions or good will. Moreover, such deliberate action related to a crucial issue in a trial without any physical evidence of the claimed abuse—weighing the credibility of all the complaining witnesses against the credibility of the defense expert witness who had criticized the methods used to interview them. *Cf. Marshall,* 294 Kan. at 863-65.

We also conclude the prosecutor's references to grooming indicate prosecutorial ill will. As in *Simmons,* here the prosecutor not only made repeated references to a psychological or medical condition, but she also did so without any attempt to introduce evidence on the issue. See 292 Kan. at 418. Despite the State's claim that it was using the word grooming in the ordinary sense, there was no way for the jury to determine whether the prosecutor was doing so or instead discussing the psychological concept of grooming. Consequently, the prosecutor was effectively introducing the psychological concept in violation of rules governing argument about facts not in evidence. See *Chanthaseng,* 293 Kan. at 146-47; *Simmons,* 292 Kan. at 418.

We also conclude that the prosecutor's comments on the witnesses' credibility were motivated by ill will. Although she did remind the jury that weighing the credibility of the witnesses was ultimately its responsibility, she then directly contradicted her admonition by repeatedly stating her personal opinion as to the witnesses' credibility. She opined all three complaining girls were credible and Akins was not. See *Ochs,* 297 Kan. at 1103 (whether the conduct was repeated is considered when determining whether comments were motivated by ill will).

*The misconduct influenced the jury's decision.*

We must ultimately determine whether these three instances of prosecutorial misconduct were harmless under *Tosh's* third factor,

*i.e.*, whether the State has proven under the constitutional and statutory harmlessness standards that the misconduct did not affect the jury's decision. In considering this factor, we review the amount of the evidence of Akins' guilt. See *Simmons*, 292 Kan. at 420 (citing *Tosh*, 278 Kan. at 85). The State bears the burden of proving the misconduct was harmless error. *Herbel*, 296 Kan. at 1110.

In contending that the misconduct did not deny Akins a fair trial, the State argues that the jury was instructed to disregard any counsel statements that were not supported by the evidence. The State also contends the prosecutor's gold standard comments could not have affected the jury's decision because the State's witnesses Mueller and Robbins properly testified about the reliability of the Finding Words protocol. As for the prosecutor's comments on the credibility of the witnesses, the State contends this was fair argument because the prosecutor reminded the jury that it was ultimately its responsibility to assess the credibility of all witnesses. Finally, the State notes that the three instances of misconduct, even when combined, comprise only a small portion of the trial.

The State argues that even if some of the comments were misconduct, it presented sufficient evidence to prove beyond a reasonable doubt that the misconduct did not affect the outcome in this case. See *State v. Ward*, 292 Kan. 541, Syl. ¶ 6, 256 P.3d 801 (2011), *cert. denied* 132 S. Ct. 1594 (2012) (The error may be declared harmless where the party benefitting from the error proves beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record.).

Akins responds that each instance of misconduct denied him a fair trial, requiring independent reversal of his convictions and sentence. Akins first asserts that the evidence presented against him was not overwhelming. See *Bridges*, 297 Kan. at 1012 (State must show whether the evidence was of such a direct and overwhelming nature that the misconduct would likely have had little weight in the minds of jurors.). Specifically, he points out that no complaints were voiced until after he separated from the children's mother, and M's diary—which was entered into evidence—made no mention of molestation until after the separation.

Akins further emphasizes that the lack of any physical evidence, the complainants' admitted dislike of him, the jury's requested read back of the prosecutor's closing argument, his acquittal on four counts after 2 days of jury deliberation, and his consistent and categorical denials all demonstrate this was a close case. Akins also argues that the jury was never specifically instructed to disregard the three instances of misconduct. In sum, Akins argues that the State cannot meet its burden of showing that the misconduct did not affect the outcome of the case.

We agree with Akins that the prosecutor's actions denied him a fair trial, and therefore constitute reversible error. The misconduct was not ameliorated by evidence which was so overwhelming that the misconduct could not have influenced the jury's decision. There was no physical evidence of Akins' guilt, and he consistently and steadfastly maintained that he was innocent. So the jury was charged with deciding the case based on the testimony of witnesses, making their credibility of paramount importance.

With credibility having such importance, we conclude any strength of the State's case was bolstered by the prosecutor's opinions on the credibility of numerous witnesses. And her witnesses' credibility—and hence the strength of her case—was reinforced by her comments that the Finding Words protocol served as the gold standard for interviewing child victims of sexual abuse. Moreover, her citation of the *Mooneyham* case in support of her declaration essentially showed a lay jury that a court had already authoritatively pronounced the Finding Words protocol to be an unmatched interview method—contrary to defense expert witness Nichols' criticisms of the protocol. And by showing Nichols was unfamiliar with *Mooneyham* and its purported holding, Nichols' testimony as a knowledgeable expert questioning the reliability of the interviews was even further diluted.

The integral part that the gold standard comments played in improperly fortifying the credibility of the complaining witnesses' testimony and diluting Nichols' testimony is suggested by an assertion taken from the prosecutor's closing argument:

"Each of these girls with their own take on it, with their own point of view, so no embellishment. *Yes, they are credible. They are not tainted or they have not been*

*poisoned by the suggestibility that the expert is trying to get you to buy."* (Emphasis added.)

Similarly, the introduction of the grooming concept without any supporting evidence and the accompanying misstatement of the law regarding grooming as proof of sexual intent very well could have tipped the jury's decision. And, despite the judge's instruction to disregard statements not supported by the evidence, this generalized instruction was insufficient to cure the comments. The instruction did not specifically address the instances of misconduct and left it for the jurors to determine what comments were supported by evidence and what comments were not.

Considering the overall standard of review for determining the magnitude of constitutional error as articulated in *Ward*, 292 Kan. 541, Syl. ¶¶ 5-6, we specifically conclude the State has failed to meet its burden to prove beyond a reasonable doubt that the misconduct did not affect the outcome of the trial in light of the entire record, *i.e.*, where there is no reasonable possibility that the error contributed to the verdict. See 292 Kan. 541, Syl. ¶ 6. Given this holding, we need not determine whether the State has met its burden of showing harmless error under the lower standard articulated in K.S.A. 60-261. See *Herbel*, 296 Kan. at 1111.

Because the prosecutor's misconduct denied Akins a fair trial, we reverse all of Akins' convictions and his sentences and remand this matter to the district court for a new trial.

Akins claims the district court committed further error. These claims could now be disregarded because of our reversal and remand on prosecutorial misconduct grounds. We address some of them below, however, to supply guidance because they could arise in a retrial. For this reason, any argument by the State that the claims were not preserved for appeal, or that Akins' rights, if violated, do not warrant reversal, are now moot. See *Foster*, 280 Kan. at 861.

Issue 2: *The district court erroneously excluded testimony about prior false allegations of sexual abuse because the witnesses were related to Akins.*

Akins argues that the district court erroneously excluded testimony he proffered from his family that M had previously made false allegations of sexual abuse against her own father. The State responds that the evidence was properly excluded: if not for the "family witnesses" rationale relied upon by the court, then for several others.

*Standard of review*

We use a multistep analysis when reviewing a district court's decision to exclude evidence. *Bridges*, 297 Kan. at 995 (citing *State v. Shadden*, 290 Kan. 803, 817, 235 P.3d 436 [2010]). First, we determine whether the evidence is relevant, *i.e.*, both probative and material. 297 Kan. at 995-96 (citing K.S.A. 60-401[b]; *State v. Martinez*, 290 Kan. 992, 1009, 236 P.3d 481 [2010]). We review the district court's conclusion of whether evidence is probative for an abuse of discretion. But we review the determination of materiality de novo. *Shadden*, 290 Kan. at 817 (citing *State v. Reid*, 286 Kan. 494, 507-09, 186 P.3d 713 [2008]).

For relevant evidence, our next step requires us to determine whether the district court applied the correct legal principles, and we review that decision de novo. The third step requires us to review how the district court applied the applicable rule or principle. *Bridges*, 297 Kan. at 996 (citing *Shadden*, 290 Kan. at 817). Depending on the rule being applied, this court reviews the district court's application of the pertinent rule either for an abuse of discretion or de novo because "[s]ome rules and principles grant the district court discretion, while others raise matters of law." 297 Kan. at 996 (citing *Shadden*, 290 Kan. at 817). Here, the district court concluded that the disputed testimony was inadmissible "as a matter of law," a decision which we review de novo.

*Discussion*

The State moved in limine to exclude any evidence that the complainants had been sexually abused in the past. Akins responded that he had no intention of introducing evidence of past

abuse but that he did intend to introduce testimony that Jennifer or M, or both, had falsely accused M's biological father of sexual abuse. Both parties agreed that testimony about past accusations was not covered by Kansas' rape shield law, K.S.A. 21-3525. But the State sought to exclude the testimony as improper character evidence because Akins sought to use specific incidents of conduct to prove that Jennifer and M are dishonest. The State argued that dishonesty is a character trait, and the use of specific instances to prove dishonesty is barred by K.S.A. 60-422(d).

Akins responded that testimony about Jennifer's and M's prior accusations is permissible impeachment evidence to show a witness' bias, prejudice, or ulterior motive. Akins argued further that he was entitled to introduce the testimony under the Sixth Amendment's Confrontation Clause because it formed an integral part of his defense. Because Akins denied all of the allegations against him, he argued that Jennifer's and M's credibility was a central issue in the trial. Therefore, Akins argued, exclusion of testimony that they falsely accused another person of sexual abuse would prevent him from asserting an essential part of his defense. Akins concluded that even if that evidence was inadmissible under statutory evidentiary rules, those rules must bend to his confrontation right.

Akins proffered testimony from four people, all of whom were related to him: Akins' father, Mike Akins, Sr.; Akins' stepmother, Marsha Akins; Akins' cousin, Christena Weber; and Akins' paternal half-sister, Angelia Howard. Akins proffered that each witness would testify that Jennifer or M had said that either M's biological father committed sexual abuse, or that they had falsely accused him of doing so. Akins' father, a former minister, would have particularly testified that during informal counseling sessions with M and Jennifer, each independently told him M had accused her biological father of sexually abusing her and later recanted that accusation. According to Akins' father, M explained she had made up the story because she was angry at her own father for leaving the family.

According to the prosecutor, Jennifer and M steadfastly denied ever making false allegations against M's biological father. The State argued that the proffered witnesses' testimony was unreliable

because all of the witnesses were related to Akins. Further, the State noted that there was no third-party corroboration by witnesses unrelated to Akins and that no person reported the alleged accusations to law enforcement. According to the State, without independent corroboration that the accusations were actually made, the testimony should be excluded.

The district court excluded the proffered testimony because the witnesses were related to Akins and defense counsel failed to establish by "independent evidence" that prior accusations were made. It relied on *State v. Penn*, 41 Kan. App. 2d 251, 201 P.3d 752 (2009). In *Penn*, the Court of Appeals held that the defendant had failed to lay proper foundation for the admission of reputation or opinion testimony that the complainant was dishonest. 41 Kan. App. 2d at 273-74. Drawing from *Penn*'s lack of foundation analysis, the district court held that specific instances of conduct are admissible to prove character only if the proponent has independent evidence other than testimony by witnesses who are related to the defendant. The court noted that things such as reports to a third party would satisfy the independent evidence requirement. But here, such evidence was missing.

We conclude the district court erred by excluding testimony of Jennifer's and M's past allegations of sexual abuse by M's father based solely on the witnesses' relationship with Akins. K.S.A. 60-407(a) provides that "every person is qualified to be a witness." And a witness' familial relationship with a party, or some other potential biases, is not grounds for excluding the witness' testimony. The family relationship only goes to the weight of the evidence, *i.e.*, credibility of the witness' testimony. See *State v. Lewis*, 252 Kan. 535, 537, 847 P.2d 690 (1993). Accordingly, the district court should not have required Akins to provide corroboration before admission of his evidence solely because it was composed of testimony of four family members. If the testimony is admitted at retrial, the State will be permitted to question the witnesses about their relationship with Akins because " '[b]ias, interest, or improper motives of a witness may always be shown in order to place the witnesses' testimony in proper perspective.' " *State v. Abu-Fakher*,

274 Kan. 584, 600-01, 56 P.3d 166 (2002) (quoting *State v. Bowman*, 252 Kan. 883, Syl. ¶ 1, 850 P.2d 236 [1993]).

We do not reach the issue of whether the testimony is ultimately inadmissible on other grounds argued by the State. The record on appeal is insufficient for this court to make that determination. We only conclude that the district court erred by excluding the testimony based solely on the witnesses' relationship with Akins. So our decision should not be interpreted as determinative on any other evidentiary basis.

Issue 3: *The trial court should use written unanimity and multiplicity jury instructions on remand.*

Akins argues that the district court erred in its instructions to the jury regarding unanimity and multiplicity. Without a change to the State's procedures at retrial, this issue will likely arise again. So we will briefly address why written instructions regarding unanimity and multiplicity are a better practice than an oral election in this case.

### Standard of review

The parties do not dispute that this is a "multiple acts" case, *i.e.*, a case where " 'several acts are alleged and any one of them could constitute the crime charged.' " *State v. Voyles*, 284 Kan. 239, 244, 160 P.3d 794 (2007) (quoting *State v. Kesselring*, 279 Kan. 671, 682, 112 P.3d 175 [2005]). In multiple acts cases, the jury must unanimously agree which specific act constitutes the crime. See K.S.A. 22-3421; *State v. King*, 297 Kan. 955, 977, 305 P.3d 641 (2013). And, to ensure jury unanimity in multiple acts cases, "the trial court must give the jury a unanimity instruction, or the State must elect the particular act it relies on for conviction." *King*, 297 Kan. at 978 (citing *Voyles*, 284 Kan. at 244-45).

We review the court's failure to give a unanimity jury instruction under a clearly erroneous standard where an objection to, or request for, a certain instruction was not made at trial. *State v. Bailey*, 292 Kan. 449, 455, 255 P.3d 19 (2011). An instruction is clearly erroneous if the appellate court " 'is firmly convinced there is a real possibility the jury would have rendered a different verdict if

the trial error had not occurred.' " 292 Kan. at 455 (quoting *State v. Martinez*, 288 Kan. 443, 451-52, 204 P.3d 601 [2009]).

*Discussion*

Akins' jury was instructed about the need for unanimity only regarding the charges of aggravated indecent liberties. But in addition to these charges, the State also relied on multiple acts to prove the numerous counts charging Akins with indecent liberties, indecent solicitation, and aggravated indecent solicitation. While the State did make an oral election to the jury as to the acts upon which it was relying for the charges of aggravated indecent liberties and indecent solicitation, it made no oral election for the charges of aggravated indecent solicitation.

Akins argues that the oral elections and failure to elect were clearly erroneous, requiring reversal. But the State contends that its oral elections satisfied the "elect or instruct" standard of *Voyles*. The State admits that its failure to elect or instruct on the charge of aggravated indecent solicitation was erroneous, and as noted, its contention that the error was harmless is now moot.

As this case demonstrates, using written unanimity jury instructions in a multi-count and multi-charge case is a much better practice than using an oral election. Against Akins, the State submitted 19 counts to the jury, including lesser-included offenses, alternative counts, and sub-counts. And the alleged conduct supporting the charges happened in multiple places, with four different victims and over a period of approximately 7 months.

During deliberations, the jury asked the court for further clarification about which incident the State relied on for which count. Written unanimity instructions containing those specifications would have clarified this complex case for the jury. Accordingly, the use of such written unanimity instructions specifying the multiple act counts is highly recommended on remand.

Issue 4: *Akins' jury polling argument is moot.*

Akins argues that the district court erred by failing to comply with the jury-polling statute, which provides in relevant part that "inquiry [shall] be made whether [the verdict] is the jury's verdict." K.S.A. 22-3421. Specifically, Akins argues that the district court

failed to comply with the statutory obligation because it only asked if anyone desired that the jury "be polled," and did not ask the jury whether this was its verdict. Akins did not object to the district court's failure.

Given that Akins raises this issue on appeal, the issue—and his failure to object—probably will not arise on remand because the district court will closely follow the statute.

Issue 5: *Akins' argument that cumulative error denied him a fair trial is moot.*

Akins argues that the combination of prosecutorial misconduct, erroneous evidentiary rulings, and erroneous jury instructions constitutes cumulative error that denied him a fair trial. Because we reverse and remand on the misconduct, and because we have briefly addressed the other two issues for guidance on remand, we need not address the cumulative error argument.

Issue 6: *Akins' argument that his sentences are unconstitutionally disproportional to the crimes charged is moot.*

Akins argues that his two presumptive life sentences are unconstitutional under Section 9 of the Kansas Constitution Bill of Rights and the Eighth Amendment to the United States Constitution, made applicable to the states through the Due Process Clause of the Fourteenth Amendment. But again, because a new jury may not convict on the requisite crimes, or, if so, the judge may not impose such sentences, this argument is moot.

Reversed and remanded for new trial.