NOT DESIGNATED FOR PUBLICATION

No. 115,024

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

ROBERT KRAHL,
*Appellant*.

MEMORANDUM OPINION

Appeal from Johnson District Court; KEVIN P. MORIARTY, judge. Opinion filed July 28, 2017. Affirmed.

*Kai Tate Mann*, of Kansas Appellate Defender Office, for appellant.

*Shawn E. Minihan*, assistant district attorney, *Stephen M. Howe*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before MALONE, P.J., LEBEN and BRUNS, JJ.

*Per Curiam*: Robert Krahl appeals his convictions of two counts of aggravated indecent liberties with a child stemming from an incident involving his 8- and 10-year-old grandsons. Krahl argues that (1) the district court erred in admitting evidence of statements he made about future conduct; (2) the district court erred in denying his motion for a directed verdict based on insufficiency of the evidence; (3) the district court erred in failing to instruct the jury on the definition of "lewd"; (4) the State engaged in multiple instances of prosecutorial error; and (5) he was denied a fair trial based on cumulative error. For the reasons stated herein, we affirm the district court's judgment.

1

On May 13, 2013, 10-year-old I.C. approached his mother, Krystal K-C, and told her that earlier that day his grandfather, Krahl, had touched his and his 8-year-old brother J.C.'s genitals. I.C. told Krystal that after picking them up from school, Krahl told I.C. and J.C. to go to an upstairs bedroom, pull down their pants, and Krahl then touched their penises and testicles and told them not to tell anyone. I.C. also told Krystal that Krahl had discussions with them about puberty. Krystal went to J.C.'s room and asked him about what I.C. just told her. J.C. was emotional and upset but confirmed I.C.'s allegations.

That night, Krystal drove to Krahl's home and confronted him about I.C.'s allegations. She expressly instructed Krahl that he was not to engage in any sex education with her children and that if it continued he would never be allowed to see I.C. and J.C. again. Krahl did not say anything and walked out of the room. Afterwards, Krystal contacted the police who arranged forensic interviews for I.C. and J.C. at the Sunflower House. The day before the boys' scheduled interviews, Krahl contacted Krystal via email asking her to meet him and telling her that she was wrong to go to the police. Krystal picked up Krahl and his wife, Nancy, in her van and they drove to a parking lot to talk. Krahl told Krystal that he had taken the boys upstairs and told them to remove their pants and that he did touch their genitals but it was to teach them about testicular cancer.

Erin Miller-Weiss, a forensic interviewer at the Sunflower House interviewed I.C. on May 22, 2013. I.C. told Miller-Weiss that on May 13, 2013, Krahl picked him and his brother up from school. I.C. and J.C. were supposed to practice piano but instead Krahl told them to go upstairs. Krahl had an orange package under his arm and he told I.C. and J.C. to sit down on the bed. Krahl opened the package, which contained a book called *The Facts of Love, Living, Loving and Growing Up* (*Facts of Love*). I.C. stated that Krahl had showed them the book before but only when nobody else was home because "he knows he's not supposed to." Krahl sat down next to I.C. and J.C. on the bed and showed them

2

pictures of people going through puberty, including naked people from toddler age to adults. I.C. stated that about a year earlier, Krahl had also brought a printed document about puberty to I.C.'s house and urged I.C. to read it.

I.C. told Miller-Weiss that after showing them the book, Krahl told them to pull down their pants so he could show them something. Krahl then touched their privates with his finger and showed them the "pee tube" on their privates. I.C. also said that Krahl was moving their private parts around and showing them how long their private parts were. Krahl touched J.C. first. According to I.C., Krahl touched each of them for about 9 minutes; he was aware of the time because there was a digital clock in the room. I.C. also stated that this was not the first time Krahl had asked them to pull down their pants, but it was the first time he had asked them to pull down their underwear. After Krahl finished touching I.C. and J.C., he told them that next time they were alone he would talk about how to get a girl pregnant and how to have sex with themselves. He also told them not to tell anybody about what had occurred.

Melissa Harris, another forensic interviewer at the Sunflower House, conducted J.C.'s interview on the same day. J.C. told Harris that Krahl told him and I.C. to go to an upstairs bedroom and told them to pull down their pants and he told them about their "front privates." J.C. then said that Krahl touched his front private, showed them where the "pee tube" was, and explained about semen and conception. J.C. stated that Krahl touched his private part with his fingers and "pulled it up and told us about the tubes," but then he had J.C. touch his own private part "all the way to the bottom."

When asked about the *Facts of Love* book, J.C. stated that it had "sex and gay in it" and things that children should not know about. He also stated that the book had pictures of "private parts" and showed naked boys and girls in different stages of development. J.C. told Harris that he had seen the book previously and that Krahl had showed him pictures of bodies in various stages of development and "the inside of a

3

private," and it made him uncomfortable and scared because he had never seen pictures like that before. Finally, J.C. stated that Krahl told I.C. and J.C not to tell anyone or they would get in big trouble.

Detective Leslie Smith sat in on the boys' Sunflower House interviews. As a result of what she heard, Smith obtained consent from Nancy to search Krahl's residence. Nancy told Smith that she had found the *Facts of Love* book in the bottom drawer of a cabinet as well as three other books. The *Facts of Love* book was inside a brown envelope and had tabs on specific pages with pictures of naked males and females in various stages of sexual development. The book also had tabs on pages containing drawings of male and female genitalia.

On July 23, 2013, the State charged Krahl with two counts of aggravated indecent liberties with a child, one count involving I.C. and the other count involving J.C. Krahl was bound over for trial on the charges after a preliminary hearing. On October 23, 2013, the State filed a motion to admit K.S.A. 60-455(d) evidence. Specifically, the State requested that it be allowed to introduce evidence at trial of two prior instances of sexual misconduct to establish Krahl's propensity to commit sexual offenses against children. The first incident involved Krahl's son, K.K., who would testify that Krahl sexually abused him as a child under the guise of sexual education. The second incident involved L.S., a family friend of Krahl as a child, who would testify that Krahl molested him as well. After hearing arguments of counsel, the district court ruled that K.K.'s testimony was admissible but L.S.'s testimony would not be allowed at trial. Specifically, the district court found that L.S.'s proposed testimony would be more prejudicial than probative as it involved an incident that occurred over 50 years ago.

Krahl's trial began on July 6, 2015. Krystal testified first about I.C.'s disclosure that Krahl had touched his and his brother's genitals. She also testified about her confrontation with Krahl that same night and stated that she had told Krahl previously

4

that he was not supposed to be talking about sex education with her children. Krystal testified that Krahl admitted to her that he had touched I.C. and J.C.'s genitals but that it was for sexual education purposes. Specifically, he told Krystal that he was teaching the boys how to screen themselves for testicular cancer.

Krystal also testified about Krahl's abuse of her brother, K.K., when he was a child. Krystal stated that on one occasion, she followed Krahl and her brother upstairs and watched them enter the bathroom. When she looked into the bathroom, Krystal stated that she saw Krahl masturbating and ejaculating into the sink while K.K. watched. Though she did not understand what was happening at the time, Krystal stated that she remembered Krahl saying that he was trying to show K.K. what his body could do.

I.C. testified next and largely restated what he had said during his forensic interview. He testified that on May 13, 2013, Krahl picked him and his brother up from school because they were supposed to practice piano at Krahl's house. Instead, Krahl took them upstairs and opened an envelope that had the *Facts of Love* book in it. I.C. testified that he had seen the book before between 5 and 10 times. On that day, Krahl showed I.C. and J.C. pictures of naked males and females in various stages of development.

Krahl then put the book away and told J.C. to lower his pants and underwear. I.C. stated that at that point, Krahl started touching J.C.'s penis and testicles. Next, he told I.C. to get on the bed and lower his pants and underwear. I.C. testified that he did not want to, but he felt that he did not have a choice. Krahl then proceeded to touch I.C.'s penis and showed him his "pee tube." According to I.C., the touching went on for between 10 and 20 minutes. Over defense counsel's objection, I.C. also testified that Krahl told him and J.C. that the next time they were alone together, Krahl was going to show them how to "have sex with [themselves] when [their] wife did not want to have sex with [them]."

5

J.C. then testified. He stated that on May 13, 2013, Krahl made him and his brother go upstairs to a bedroom and pull down their pants and underwear. Although J.C. had stated in his forensic interview that Krahl had touched his genitals, at trial J.C. testified that Krahl made him touch his own penis and that Krahl never touched him. J.C. further testified that Krahl was teaching them about the "tube on [their] penis." J.C. did not remember being shown the *Facts of Love* book on that day, but he stated that he had seen the book on previous occasions and it contained pictures of naked men and women. Finally, J.C. testified that Krahl told them not to tell their parents about what happened.

The State next called Miller-Weiss and Harris. After explaining their forensic interviewing experience and the purpose of a forensic interview, the State played recordings of both I.C. and J.C.'s forensic interviews for the jury. Next, Smith testified about her search of Krahl's residence and finding the *Facts of Love* book along with the three other books about sex education and puberty.

K.K. testified next. He stated that when he was 3 1/2 or 4 years old his father, Krahl, masturbated into a sink in front of him. K.K. also testified that when he was around 11 years old, Krahl brought him to an upstairs bedroom and told him that he was going to teach him about his body and sexual development. K.K. stated that Krahl told him to put on a pair of tight swim trunks and talked to him about the changes that would occur to his body during puberty. Krahl then asked K.K. to take the swim trunks off and lay on the bed. K.K. testified that Krahl touched his penis and testicles while showing him "the intricate blood vessels and how delicate the skin was." Later, Krahl performed oral sex on K.K. The next day, Krahl told K.K. to go back to the bedroom and stated that they were going to "finish where [they] left off yesterday." K.K. stated that when Krahl left to get supplies, he got on his bike and left the house. K.K. explained that he thought about telling someone about what happened, but he did not want to upset his family.

6

Finally, Nancy testified. She stated that during the conversation between herself, Krystal, and Krahl that occurred in Krystal's van, Krahl explained that he touched I.C. and J.C.'s genitals because he believed I.C. and J.C. were at risk for testicular cancer. She also testified that prior to locating the *Facts of Love* book, she had never seen it before. Following Nancy's testimony, the State rested.

Krahl did not present evidence and did not testify. Krahl's theory of defense, however, was that he was not sexually abusing I.C and J.C. but instead was engaging in sex education. After hearing the evidence and closing arguments, the jury found Krahl guilty of both counts of aggravated indecent liberties with a child. On September 3, 2015, the district court sentenced Krahl to two concurrent life sentences without the possibility of parole for 25 years. Krahl timely appealed his convictions.

STATEMENT ABOUT FUTURE CONDUCT

In a pretrial motion in limine, Krahl asked the district court to prohibit any references to, or testimony about, K.S.A 60-455 evidence, including "allegations of prior or future conduct that could amount to a crime." Specifically, Krahl did not want the district court to admit the statement that he made to I.C. and J.C that the next time they were alone he was going to teach them how to have sex with themselves. Krahl urged the district court to exclude the statement under K.S.A 60-455 and also argued that it was not relevant. The district court ruled that the statement was not K.S.A 60-455 evidence because it was not a prior act and that it was relevant to explain why I.C. and J.C. "purportedly did what they did as far as when they came forward." Accordingly, the district court ruled that Krahl's statement regarding what he was going to do with I.C. and J.C. the next time they were alone together was admissible as evidence. At trial, the State asked I.C. whether Krahl had made any statement about what would happen the next time they were together; Krahl unsuccessfully objected on the grounds of relevance.

7

Now on appeal, Krahl asserts that the district court's denial of his objection was error. Krahl appears to have abandoned his argument that his statement should not have been admitted under K.S.A. 60-455 and instead argues that the statement about what Krahl was going to do next time he saw I.C. and J.C. was not relevant. Furthermore, Krahl states that even if the statement was relevant, it should have been excluded under K.S.A. 60-445 because its probative value was outweighed by its prejudicial effect.

The State points out that at trial Krahl only objected on the grounds of relevance and, therefore, the State argues that Krahl failed to preserve the argument that the statement was inadmissible under K.S.A. 60-445. The State then argues that the statement was relevant because it was both probative and material to disprove Krahl's theory of defense that he was engaged in an innocent touching.

An appellate court's standard of review for a relevancy inquiry is well known:

"The test for relevancy is whether the evidence has 'any tendency in reason to prove any material fact.' [Citations omitted.] This definition requires the evidence to be material and probative. Evidence is material when the fact it supports is in dispute or in issue in the case. Review for materiality is de novo. [Citation omitted.] Evidence is probative if it has any tendency to prove any material fact. [Citation omitted.] Appellate courts review the district court's assessment of the evidence's probative value under an abuse of discretion standard. [Citation omitted.]" *State v. Dupree*, 304 Kan. 43, 63-64, 371 P.3d 862 (2016).

When I.C. testified that Krahl told the boys that he was going to teach them how to have sex with themselves the next time they were alone together, defense counsel objected on grounds of relevance. On appeal, Krahl claims that the statement about what he intended to do in the future was not relevant because it had no bearing on whether he committed aggravated indecent liberties with a child on May 13, 2013. This argument is unpersuasive; Krahl's statement about what he intended to do the next time he saw I.C. and J.C. was material because it supported a fact at issue. Specifically, Krahl's statement

8

was material because it showed that his intent was to satisfy the sexual desires of himself, I.C. and J.C., or both—which is a required element of the crime of aggravated indecent liberties with a child. See K.S.A. 2016 Supp. 21-5506(b)(3)(A). Furthermore, the statement was probative because it had the tendency to disprove Krahl's theory of defense that he was merely engaging in sexual education with the boys. Thus, the district court did not err in overruling Krahl's objection to the statement at trial based on relevance.

On appeal, Krahl also argues that his statement should have been excluded under K.S.A. 60-445 because it was more prejudicial than probative. In Kansas, a verdict will not be set aside on the grounds of erroneous admission of evidence unless the complaining party has lodged a timely and specific objection to the alleged error at trial. K.S.A. 60-404; *State v. Logsdon*, 304 Kan. 3, 28, 371 P.3d 836 (2016). At trial, Krahl only objected to the admission of the statement on the grounds of relevance and not under K.S.A. 60-445, which permits a district court to exclude otherwise relevant evidence if its probative value is outweighed by its prejudicial effect. Thus, because Krahl did not lodge a contemporaneous objection to the statement at trial based on K.S.A. 60-445, the issue is not properly preserved for appeal. See *Logsdon*, 304 Kan. at 29.

In any event, Krahl's argument under K.S.A. 60-445 is without merit because the probative value of the statement in question was not outweighed by its prejudicial effect. Krahl's statement that he was going to teach I.C. and J.C. how to have sex with themselves the next time they were alone is extremely probative because it directly contradicts Krahl's theory of defense—namely, that he was engaged in sex education. Contrary to Krahl's assertion, the effect of this statement was not to permit the jury to convict Krahl in order to prevent him from committing this future act. Any potential for prejudice from this statement was outweighed by its probative nature. For all these reasons, the district court did not err in admitting Krahl's statement about future conduct.

9

After the State's case-in-chief, Krahl moved for a directed verdict, arguing that the State presented insufficient evidence to prove that Krahl had the intent to arouse the sexual desires of either himself or the victims as required by statute. The district court denied Krahl's motion, finding that in the light most favorable to the State, there was enough evidence to continue with the trial.

A motion for a directed verdict following the State's case-in-chief is essentially a motion for judgment of acquittal and is decided based on the standards of sufficiency of the evidence. *State v. Wilkins*, 267 Kan. 355, 365, 985 P.2d 690 (1999). When the sufficiency of evidence is challenged on appeal, the appellate court reviews all the evidence in the light most favorable to the State. A conviction will be upheld if the court is convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt based on that evidence. *State v. Laborde*, 303 Kan. 1, 6, 360 P.3d 1080 (2015). In determining whether there is sufficient evidence to support a conviction, the appellate court generally will not reweigh the evidence or reassess the credibility of witnesses. *State v. Daws*, 303 Kan. 785, 789, 368 P.3d 1074 (2016).

K.S.A. 2016 Supp. 21-5506(b)(3)(A) defines aggravated indecent liberties with a child as:

> "(3) engaging in any of the following acts with a child who is under 14 years of age:
> (A) Any lewd fondling or touching of the person of either the child or the offender, done or submitted to with the intent to arouse or to satisfy the sexual desires of either the child or the offender, or both."

Accordingly, to prove that Krahl was guilty of the charges, the State had to establish that: (1) Krahl lewdly touched I.C. and J.C.; (2) the lewd touching was intended

10

to arouse or satisfy the sexual desires of either himself, the victims, or both; (3) I.C. and J.C. were under the age of 14 at the time of the acts; and (4) the conduct took place in Johnson County on or about May 13, 2013. *State v. Reed*, 300 Kan. 494, 499, 332 P.3d 172 (2014), *cert. denied* 135 S. Ct. 1566 (2015); see PIK Crim. 4th 55.120 (2012 Supp.).

*Intent to arouse the sexual desires of Krahl, I.C. and J.C., or both*

Krahl first argues that the State presented insufficient evidence to find him guilty of aggravated indecent liberties with a child because it provided no evidence that Krahl touched I.C. or J.C. in order to arouse or satisfy his or the victims' sexual desires. Instead, Krahl argues that the evidence overwhelmingly shows that he "was simply engaging in sexual education." The State argues that based on the way Krahl touched I.C. and J.C., and the boys' reaction to the touching, Krahl was not engaging in sexual education but instead was intending to arouse the sexual desires of himself, the boys, or both.

The Kansas Supreme Court has made clear that "[a]ctual arousal or satisfaction of the sexual desires of either participant is not necessary for the existence of the crime." *Reed*, 300 Kan. at 502 (quoting *State v. Brown*, 295 Kan. 181, 201, 284 P.3d 977 [2012]). K.S.A. 2016 Supp. 21-5506 merely requires the specific intent to arouse, which can be proved through circumstantial evidence. *Reed*, 300 Kan. at 502. As our Supreme Court has said, "conviction of even the gravest offense '"can be based entirely on circumstantial evidence and the inferences fairly deducible therefrom."' [Citations omitted.]" *State v. McCaslin*, 291 Kan. 697, 710, 245 P.3d 1030 (2011), *overruled on other grounds by State v. Astorga*, 299 Kan. 395, 402, 324 P.3d 1046 (2014).

Although there is no evidence of actual arousal here, the circumstantial evidence is sufficient to prove Krahl's intent to arouse or satisfy his sexual desires. Krahl instructed I.C. and J.C.—against their wishes—to go to an upstairs bedroom. Krahl then showed I.C. and J.C. pictures of naked people from the *Facts of Love* book—which he had done

11

on prior occasions, but only when no one else was at home. I.C. testified that Krahl made him lower his pants and underwear, lie down on the bed, and Krahl then touched I.C.'s penis and testicles. J.C. testified that Krahl made him touch himself; but at his forensic interview, J.C. stated that Krahl touched his genitals. I.C. also testified that Krahl touched both his and J.C.'s genitals. After the incident, Krahl told both boys not to tell anyone.

Krahl argues that the evidence shows that he was engaging in sexual education when he touched I.C. and J.C. But the jury already heard this argument and rejected it. Now Krahl is asking this court to do what it explicitly cannot: reweigh and resolve conflicting evidence. See *Daws*, 303 Kan. at 789. The evidence presented at trial, viewed in the light most favorable to the State, was sufficient to permit a rational factfinder to find beyond a reasonable doubt that Krahl touched I.C. and J.C. with the intent to arouse the sexual desires of himself, the victims, or both.

*Sufficiency of the evidence to establish that Krahl's touching was lewd*

In a related argument, Krahl claims that the evidence presented at trial was insufficient to establish that the touching was lewd. Instead, Krahl argues that "[t]he alleged acts described by [I.C. and J.C.] [are] much more consistent with a simple anatomy lesson than [they are] with sexual touch." The State, in turn, argues that Krahl touched I.C. and J.C. in a lewd manner, especially when considering that Krahl touched them after showing them a book with pictures of naked people—including close-up pictures of genitalia.

Whether an action constitutes lewd fondling or touching depends on the totality of the circumstances and is a question for the jury. *State v. Rutherford*, 39 Kan. App. 2d 767, 776, 184 P.3d 959, *rev. denied* 286 Kan. 1184 (2008); *State v. Stout*, 34 Kan. App. 2d 83, 87-88, 114 P.3d 989, *rev. denied* 280 Kan. 991 (2005). In *State v. Ta*, 296 Kan. 230, 242-43, 290 P.3d 652 (2012), the Kansas Supreme Court stated:

"[A] defendant's mental state should not be used to define or determine whether a touching is lewd. . . . [W]hether a touching is lewd should be determined by considering the common meaning of the term 'lewd,' that is whether a touching is 'sexually unchaste or licentious; suggestive of or tending to moral looseness; inciting to sensual desire or imagination; indecent, obscene, or salacious.' [Citations omitted.] In considering if a touching meets this definition, a factfinder should consider whether the touching 'tends to undermine the morals of a child [and] . . . is so clearly offensive as to outrage to the moral senses of a reasonable person.' [Citations omitted.]"

In *Ta*, the defendant was charged with aggravated indecent liberties with a child after approaching two children and touching their hair, face, arms, and legs. The defendant admitted to having strong desires to have sex with children but at trial moved for a judgment of acquittal, arguing that the State presented no evidence that he actually committed a lewd touching. 296 Kan. at 233. The State, in turn, argued that even a "normal touching," such as what occurred here, could be lewd when based on the totality of the circumstances. 296 Kan. at 238. The Kansas Supreme Court held that this sort of touching, when considered in isolation, was not lewd, and even when considered in light of the surrounding circumstances, it still was not lewd. 296 Kan. at 243. Instead, our Supreme Court found that the defendant's touches, while certainly "awkward and strange," were not "indecent, obscene, salacious, unchaste, or licentious." 296 Kan. at 243. Thus, our Supreme Court reversed the defendant's convictions of aggravated indecent liberties with a child because the State failed to present sufficient evidence to prove the element of lewd touching. 296 Kan. at 243.

Krahl's case is clearly distinguishable from *Ta*. Here, Krahl's touching of I.C. and J.C.'s genitals cannot be considered a "normal touching," even when considered in isolation. Also, when considered in light of the surrounding circumstances—including Krahl showing I.C. and J.C. pictures of nude bodies, making them pull down their pants on other occasions, and telling them not to tell anybody—Krahl's touching was lewd. It does not matter that Krahl claims he did not intend the touching to be lewd; as our

13

Supreme Court stated in *Ta*, a defendant's mental state is not to be used to determine whether a touching was lewd. 296 Kan. at 242. Finally, the jury heard Krahl's defense that this was merely for sexual education and rejected it. Whether a touching was lewd generally is for the jury to decide and this court does not reweigh evidence. *Rutherford*, 39 Kan. App. 2d at 776. Instead, this court merely determines if the evidence presented at trial was sufficient to permit a reasonable factfinder to find that Krahl's touching of I.C.'s and J.C.'s genitals was lewd; clearly it was.

FAILURE TO INSTRUCT THE JURY ON THE DEFINITION OF "LEWD"

Krahl next claims that the district court erred in failing to instruct the jury on the definition of "lewd." Though he acknowledges that he failed to request the instruction, Krahl maintains that the district court's failure to give the instruction amounts to clear error because without the instruction, the jury was unable to properly assess whether the acts that occurred were indeed "lewd" as contemplated by the statute. The State asserts that the district court's failure to define the term "lewd" was not clear error. The State points to cases from the Kansas appellate courts that have held that the term "lewd" has a well-known and well-understood meaning, so the jury could have relied on its own understanding of the term "lewd" and did not need an instruction defining the term.

"When error in the giving or failing to give a jury instruction is claimed, [an appellate court] analyzes whether the jury instruction is legally and factually appropriate and, if so, whether the error is harmless." *State v. Solis*, 305 Kan. 55, 64, 378 P.3d 532 (2016). If the failure to give an instruction is raised for the first time on appeal, however, the failure to give the instruction will only warrant reversal if the failure was clearly erroneous; a failure to give an instruction is only clearly erroneous if the defendant firmly convinces this court that the jury would have returned a different verdict had the instruction been given. 305 Kan. at 65.

14

The jury instruction at issue here is PIK 4th Crim. 55.020(B)(h) (2014 Supp.), which states:

> "Lewd fondling or touching means fondling or touching in a manner which tends to undermine the morals of a child and is so clearly offensive as to outrage the moral senses of a reasonable person. Lewd fondling or touching does not require contact with the sex organ of one or the other."

Essentially Krahl's argument boils down to a claim that had the jury been instructed on this definition of the term "lewd," it would not have found that his touching of I.C.'s and J.C.'s genitals met that definition. Both this court and the Kansas Supreme Court have rejected Krahl's argument, holding that the term "lewd" has a well-understood meaning and whether a touching is lewd should be determined based on the common understanding of the term. See, *e.g.*, *Ta*, 296 Kan. at 242 ("[W]hether a touching is lewd should be determined by considering the common meaning of the term 'lewd.'"); *Rutherford*, 39 Kan. App. 2d at 775 ("'[L]ewd' . . . has a well-understood meaning as used in the aggravated indecent liberties with a child statute. . . . It appears that the jury here exercised reason and common sense to attribute an ordinary definition to the term.").

Krahl attempts to claim that unlike the cases above, the jury had to be instructed on the definition of "lewd" because the acts in question were not overtly sexual. Instead, Krahl argues, his case is more analogous to *Ta* where the district court reversed the defendant's convictions for aggravated indecent liberties with a child because his actions did not meet the definition of "lewd."

Unlike in *Ta*, where the defendant's touching of the children's hair, faces, arms, and legs could be deemed innocent when ignoring the defendant's statements about his subjective intent, it is difficult to view Krahl's touching of I.C. and J.C.'s genitals as innocent. The district court did not need to instruct the jury on the definition of "lewd";

15

instead, the jury permissibly relied on the ordinary meaning of the commonly understood term. We are not firmly convinced that the jury would have returned a different verdict had the instruction been given. Thus, the district court did not commit clear error by failing to instruct the jury on the definition of "lewd."

## CLAIMS OF PROSECUTORIAL ERROR

Krahl claims that the State committed prosecutorial error on multiple occasions during his trial. Specifically, Krahl contends that the State erred by: arguing that he engaged in grooming behavior, arguing facts not in evidence and misstating the evidence, misstating the law, inflaming the passions of the jury, and burden shifting. Although Krahl did not object to the prosecutor's statements and arguments at trial, an appellate court will review arguments based on claims of prosecutorial error during closing arguments even without a contemporaneous objection at the trial level. *State v. Roeder*, 300 Kan. 901, 932, 336 P.3d 831 (2014), *cert. denied* 135 S. Ct. 2316 (2015).

Appellate courts employ a two-step process to evaluate claims of prosecutorial error. *State v. Sherman*, 305 Kan. 88, 109, 378 P.3d 1060 (2016). First, the court must determine whether error occurred by deciding whether the prosecutor's actions "fall outside the wide latitude afforded prosecutors to conduct the State's case and attempt to obtain a conviction in a manner that does not offend the defendant's constitutional right to a fair trial." 305 Kan. at 109. If error has occurred, then the appellate court must determine whether the error prejudiced the defendant's right to a fair trial under the harmless error standard. "[P]rosecutorial error is harmless if the State can demonstrate 'beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, *i.e.*, where there is no reasonable possibility that the error contributed to the verdict.' [Citation omitted.]" 305 Kan. at 109.

16

*Grooming*

Krahl argues that the State committed prosecutorial error when it argued that Krahl was grooming I.C. and J.C. for further sexual abuse during its closing argument. During the trial, the district court refused to admit expert testimony on grooming and ruled that the State could not make any mention of grooming; nonetheless, Krahl argues that the State, in fact, made repeated references to Krahl's grooming behavior without ever actually using the term "grooming." Krahl also argues that the State committed prosecutorial error when it misstated the law by informing the jury that Krahl's past grooming was sufficient to prove the intent requirement of the charged crimes.

The State acknowledges that introducing evidence about grooming behavior requires expert testimony but argues that the State did not talk about grooming. Instead, the State asserts that it discussed "desensitization," which is a concept distinct from the grooming. The State claims that the "commonly understood concept of desensitization" does not require expert testimony because it is not a scientific concept.

Prior to trial, Krahl filed a motion in limine asking that the State be prohibited from making any reference to grooming "or any other similar phrase or term." At the motions hearing, the State informed the district court that it intended to qualify a social worker at the Sunflower House as an expert on grooming. The State further asserted that it was going to try to show that Krahl used the *Facts of Love* book as a grooming tool. The district court took the matter under advisement, but made clear that there could be no evidence of grooming unless the State laid a proper foundation.

At trial, during the testimony of Miller-Weiss, but outside the presence of the jury, the State requested to lay the foundation for its expert's testimony on grooming. However, after hearing arguments of counsel, the district court decided that expert testimony on grooming would not be helpful in assisting the trier of fact understand the

17

case. Therefore, the district court decided not to admit any evidence at trial on the subject of grooming. As a result of the district court's ruling, the State did not ask Miller-Weiss any specific questions about the subject of grooming.

Although the district court excluded any expert testimony at trial on the subject of grooming, the prosecutor made the following statements during closing argument.

"He used this book, this <u>Facts of Love</u> book. . . . Feel free to go through this book and look at all of the tabs and realize that these pictures that you saw in the photographs of those pictures were being used to *introduce the concept of naked adults and naked children to a child who was 8 and a child who was 10. It's used to familiarize the child with the concepts of sex, being naked, what naked looks like, and getting the kid comfortable with that.*

"Grampy here had done that multiple times with those kids, gone through that book before he had introduced the concept of let's take off your pants. That alone tells you what his intent was. *Getting them used to doing things about sex. He used a very gradual approach to do this.*" (Emphasis added.)

In rebuttal, the State again brought up Krahl's behavior:

"Those pictures are inappropriate for kids that age and they're shown to kids that age by somebody who wants to get them used to the idea of talking about sex and being naked with him. We know he did that because he did exactly the same thing with his own son. You can have no better predictor of intent of the defendant than what he did, mirrors exactly, it's the same set of behaviors, conditioning over time.

. . . .

". . . And maybe, just maybe, to the defendant sex education is demonstrating sex with these boys, his own son and his grandsons. Maybe that's what he means by sex education. But it's not his job to do that, he had been told not to do that. The only reason to do that and say it was about testicular cancer and hide all of these books is *because he's using them to get used to the idea of sex.*" (Emphasis added.)

18

Krahl contends that in making the emphasized statements, the prosecutor presented a grooming argument to the jury without using the term "grooming" and without having an expert witness to support the argument. Krahl argues that the prosecutor's comments constituted prosecutorial error and he was prejudiced by the comments to the extent that he was denied a fair trial.

"Sexual grooming is a preparatory process in which a perpetrator gradually gains a person's . . . trust with the intent to be sexually abusive. . . . Evidence of sexual grooming can be used to . . . substantiate allegations of sexual abuse where a victim's testimony is unclear or misleading." Pollack & MacIver, *Understanding Sexual Grooming in Child Abuse Cases*, 34 No. 11 Child L. Prac. 161, 166 (2015). The purpose of grooming is to "manipulate the child into becoming a co-participant which reduces the likelihood of a disclosure and increases the likelihood that the child will repeatedly return to the offender." 34 No. 11 Child L. Prac. at 165.

Our Supreme Court addressed prosecutorial error and grooming in *State v. Akins*, 298 Kan. 592, 315 P.3d 868 (2014). In that case, Akins married Jennifer B., who had five daughters and one son from a previous marriage. The two separated in 2009 and roughly 2 weeks after the separation, Jennifer asked her oldest daughter, M., if Akins had ever behaved inappropriately towards her. M. responded that Akins had touched her inappropriately. Jennifer then told her next three oldest children—E., L., and J.—that Akins had touched M. inappropriately and asked if Akins had ever touched them. All three replied in the affirmative. Jennifer reported the allegations and the four children underwent forensic interviews. Following the interviews, the State charged Akins with 21 counts of various crimes. 298 Kan. at 595.

At trial, the prosecutor made multiple references to grooming during opening and closing arguments. For example, during closing argument, the prosecutor stated:

19

"'In some of these counts there is language was this done with sexual intent, with the intent to arouse or satisfy the sexual desires. What inference, folks, do you draw from his statements in getting into bed with [the victim] in the morning calling her wifey and cuddling, pinching the little girls on the nipples . . . ? What inference do you draw? Is it a fair inference on these facts that he wanted to know when he could get access to that? *The sexual intent comes from his grooming them*, where on their bodies he was touching, jealousy like a boyfriend, how he touched them, the demonstration of the girls, the rubbing and fondling. That is where you get the sexual intent applying the facts to the law.'" 298 Kan. at 603.

Akins was convicted of six counts of aggravated indecent liberties, one count of attempted aggravated indecent liberties, one count of indecent liberties, and three counts of indecent solicitation of a child. 298 Kan. at 598. On appeal, he argued the prosecutor's statements about grooming constituted prosecutorial error because grooming is a psychological term that requires expert testimony, but instead the prosecutor "essentially made the 'grooming diagnosis' herself." 298 Kan. at 603. Akins also argued that the prosecutor misstated the law when she said that the jury could rely on Akins' grooming behavior to establish the requisite intent for the crimes charged. 298 Kan. at 603.

The Kansas Supreme Court agreed with Akins, finding that the prosecutor's statements fell outside the wide latitude afforded a prosecutor:

"Grooming is a well-known phenomenon in the context of sexual abuse. We dealt with the subject in *State v. Raskie*, 293 Kan. 906, 269 P.3d 1268 (2012). But we did not squarely address whether introducing grooming evidence required expert testimony. Our *Raskie* discussion, however, is consistent with the approaches of other jurisdictions that recognize grooming is a concept that has specific meaning in the context of sexual abuse. [Citation omitted.] And grooming evidence typically requires expert testimony. [Citation omitted.]

. . . .

". . . We observe [the prosecutor] repeatedly argued that Akins groomed the alleged victims in preparation for acts of sexual abuse. And because grooming is a well-

20

known phenomenon in sexual abuse cases, the jury could reasonably infer that the prosecutor was referring to the psychological concept of grooming. Accordingly, the prosecutor's argument required supporting evidence; without it, the prosecutor was arguing facts not in evidence." 298 Kan. at 604-05.

Our Supreme Court also found that the prosecutor's comments about grooming, when combined with two other errors, warranted reversal of the convictions because it was a close case and the evidence against Akins was not overwhelming. 298 Kan. at 613-14. The court held that the State failed to meet its burden to prove beyond a reasonable doubt that the prosecutorial error did not affect the outcome of the trial. 298 Kan. at 614.

Returning to our facts, the prosecutor argued that Krahl used the *Facts of Love* book "to introduce the concept of naked adults and naked children to a child who was 8 and a child who was 10. It's used to familiarize the child with the concepts of sex, being naked, what naked looks like, and getting the kid comfortable with that." The prosecutor further argued that Krahl's strategy was "[g]etting them used to doing things about sex. He used a very gradual approach to do this." For the purposes of this opinion, we will assume without deciding that the prosecutor presented an improper grooming argument to the jury without having an expert witness to support the argument.

However, even assuming the prosecutor committed error, we conclude the error does not merit reversal of Krahl's convictions under the facts and circumstances of this case. Prosecutorial error is harmless if the State proves beyond a reasonable doubt that the error will not or did not affect the outcome of the trial in light of the entire record. *Sherman*, 305 Kan. at 109. Put otherwise, error is harmless where there is no reasonable possibility that the error contributed to the verdict. 305 Kan. at 109.

Krahl's case differs significantly from *Akins*. In *Akins*, the victims never came forward on their own to report any abuse. Instead, Akins' estranged wife, Jennifer,

21

initially asked her oldest daughter M. if Akins had ever behaved inappropriately towards her. After M. responded affirmatively, Jennifer then told the next three oldest children that Akins had touched M. inappropriately before asking if Akins had ever touched them. In finding reversible error, the Kansas Supreme Court found the prosecutor's comments about grooming, when combined with two other errors, warranted reversal because it was a close case and the evidence against Akins was not overwhelming. 298 Kan. at 613-14.

Here, there is no reasonable possibility that the State's presumed error in arguing grooming contributed to the verdict. As pointed out by the State, the evidence against Krahl was very strong. I.C.'s and J.C.'s statements of what occurred remained consistent and clear throughout the case. K.K.'s testimony corroborated I.C.'s and J.C's accounts of what Krahl did to them. Moreover, the prosecutor did not inform the jury that Krahl's grooming behavior itself provided the necessary intent to find him guilty of aggravated indecent liberties with a child. For these reasons, even if we assume that the prosecutor erred in arguing grooming without expert testimony, we conclude there is no reasonable possibility that the error contributed to the verdict.

*Arguing facts not in evidence and misstating the evidence*

Krahl next argues that the State committed prosecutorial error by arguing facts not in evidence or distorting the facts that were introduced. He first contests the prosecutor's statement in closing arguments that his abuse of K.K. "progressed and grew until K.K. was 10 or 11." Krahl argues that K.K. only testified to two incidents, so the prosecutor's statement that Krahl's abuse "progressed and grew" misstated the facts in evidence. He also argues that the prosecutor argued facts not in evidence when he said that Krahl showed I.C. and J.C. pictures from the *Facts of Love* book to get them used to the idea of sex because "he did exactly the same thing with his own son." Krahl points out that the record is devoid of any evidence that Krahl ever showed K.K. books or pictures.

22

When explaining the extent of K.K.'s sexual abuse, the prosecutor stated:

> "You are allowed to consider what [Krahl] did to his own son to show what the intent was with these boys, with [I.C.] and [J.C.] You are allowed to consider the fact that he masturbated to ejaculation in front of his 3-1/2 to 4-year-old son. . . .
>
> . . . .
>
> "And that progressed and grew until K.K. was 10 or 11 years old, the same age range we're talking about with [I.C.] and [J.C.]. When he too is told to go to an upstairs bedroom. When he too is told to take off his pants and lay on the bed. When he too is shown—now [K.K.] uses a grown-up word, vasculature. I'll use [I.C] and [J.C's] words, pee tube. The defendant did the same thing to both is own son and his grandsons."

In rebuttal, addressing Krahl's argument that he was engaging in sexual education with I.C. and J.C. by showing them the *Facts of Love* book, the prosecutor argued:

> "Those pictures are inappropriate for kids that age and they're shown to kids that age by somebody who wants to get them used to the idea of talking about sex and being naked with him. We know he did that because he did exactly the same thing with his own son. You can have no better predictor of intent of the defendant than what he did, mirrors exactly, it's the same set of behaviors, conditioning over time. He only remembers two incidents but starts with dad demonstrating this and culminates with dad giving him oral sex."

The prosecutor here did not argue facts not in evidence. First, she did not argue that Krahl's abuse of K.K. was ongoing from toddlerhood until he was about 10 or 11; instead, the prosecutor argued that the extent and severity of the abuse "progressed and grew" from Krahl touching himself in front of K.K. to Krahl performing oral sex on him. K.K. testified about these facts, and the prosecutor did not err in arguing that based on the logical inferences from these facts in evidence, Krahl's behavior similarly escalated with I.C. and J.C. Moreover, the prosecutor did not argue facts not in evidence by claiming that Krahl showed K.K. books and pictures of naked people. When reviewing the

23

prosecutor's statement in context, she was arguing that Krahl showed I.C. and J.C. the pictures of naked people to slowly introduce them to the idea of nudity and sex, just as Krahl did with K.K., beginning by touching only himself and then escalating to performing oral sex on K.K. The prosecutor did not claim that Krahl also showed K.K. books and photos containing nudity.

Next, Krahl claims that the prosecutor misstated the evidence when she said in rebuttal that there was no evidence that Krahl was touching I.C. and J.C. for the purposes of sexual education. In closing arguments, defense counsel argued that Krahl touched I.C. and J.C. for the purpose of sexual education. In rebuttal, the State rejected that theory arguing that the evidence presented at trial did not support Krahl's defense stating: "The evidence you have in front of you doesn't have anything to do with sex education." The State went on to rebut Krahl's argument that he was engaging in sex education using evidence presented at trial. For example, the State questioned why, if Krahl was allegedly engaging in innocent behavior, he told the boys not to tell anyone and hid the *Facts of Love* book. The State concluded by asking the jury to "go back to the jury room, look at all of this evidence. . . . Use your common sense. This isn't about sex education, this is not about self-testing for testicular cancer."

These remarks do not constitute prosecutorial error as the prosecutor did not misstate or distort the facts in evidence as Krahl claims. The prosecutor did not say that there was no evidence of sexual education; instead, the prosecutor pointed to the evidence in the record, and argued that it did not support Krahl's theory of defense. "[W]hen a case turns on which of two conflicting stories is true, the parties may advocate for reasonable inferences based on evidence suggesting that certain testimony is not believable." *State v. Brown*, 298 Kan. 1040, 1053, 318 P.3d 1005 (2014). Here, the prosecutor was advocating that based on all the evidence in the record, Krahl's defense of sexual education was not believable. This argument does not fall outside the wide latitude afforded to the prosecutor during closing argument and does not constitute error.

24

*Misstatements of law*

Krahl next claims that the State committed prosecutorial error by misstating the elements of the charged crimes. Although Krahl's argument is somewhat difficult to follow, he takes issue with the prosecutor's statement during closing arguments that to find Krahl guilty the jury had to find that "the defendant engaged in lewd fondling or touching with [I.C.] with the intent to arouse the sexual desires of [I.C.] the defendant, or both." This statement, Krahl argues, misstated the law because it failed to inform the jury that the "lewd fondling or touching must have been done to the person of either the child or the offender." Instead, Krahl argues that the prosecutor's statement misinformed the jury of the required elements of the charged crime because based on the statement, the jury could have found Krahl guilty if he and I.C. "touched or fondled a third person lewdly." The State does not address this argument.

The prosecutor's statement here was not error and, even if it was, it was harmless. First, the jury heard I.C's testimony that Krahl lewdly fondled his genitals; there was no evidence presented of any lewd touching of a third person that may have confused the jury or led them to mistakenly find Krahl guilty of aggravated indecent liberties for lewdly touching a third person. Second, the jury was instructed that:

> "The defendant is charged with aggravated indecent liberties with a child, in count 1. The defendant pleads not guilty.
> "To establish this charge, each of the following claims must be proved:
> 1. That the defendant engaged in lewd fondling or touching of I.C., with the intent to arouse the sexual desires of I.C., the defendant, or both.
> 2. At the time of this act, I.C. was less than 14 years old. The State need not prove the defendant knew the child's age.
> 3. This act occurred on or about 13th of May, 2013 in Johnson County, Kansas."

25

This instruction accurately informed the jury of the required elements of the crime of aggravated indecent liberties with a child involving I.C. Thus, any possible confusion caused by the prosecutor's statement would have been remedied by this instruction.

Next, Krahl argues that the State misstated the law on the elements of aggravated indecent liberties with a child as to the charge involving J.C. During closing arguments, the prosecutor informed the jury that it could find Krahl guilty of aggravated indecent liberties with a child even if it found that Krahl neither touched nor was touched by J.C. In particular, the prosecutor stated:

> "Now the statute says engaged in lewd fondling or touching. And [J.C.] on the stand said something different than he had said at Sunflower house, 2 years later. He's in front of a lot of strangers. And he said Grampy made me touch myself. That's still engaging in lewd fondling. It's the same thing."

Krahl contends that this is a misstatement of law because the subsection of the aggravated indecent liberties statute that Krahl was charged under requires that the defendant actually touched or was touched by J.C. The State, however, argues that there is nothing in the statute that requires the lewd touching be of another person; instead, encouraging J.C. to touch himself was sufficient to satisfy the elements of the crime.

As to the charge of aggravated indecent liberties with a child involving J.C., the district court instructed the jury as follows:

> "The defendant is charged with aggravated indecent liberties with a child, in count 2. The defendant pleads not guilty.
> "To establish this charge, each of the following claims must be proved:
> 1. That the defendant engaged in lewd fondling or touching of J.C., with the intent to arouse the sexual desires of J.C., the defendant, or both.

26

2. At the time of this act, J.C. was less than 14 years old. The State need not prove the defendant knew the child's age.

3. This act occurred on or about the 13th of May, 2013 in Johnson County, Kansas."

The State argues that based on the language of the statute under which Krahl was charged, the fact that Krahl encouraged J.C. to touch himself was sufficient to satisfy the elements of the crime. Without deciding this point, we note that the jury was instructed that to establish the charge of aggravated indecent liberties with a child involving J.C., the State must prove that Krahl "engaged in lewd fondling or touching of J.C." The language of the jury instruction requires some actual contact by Krahl with J.C., which does not encompass a scenario where Krahl only encouraged J.C. to touch himself.

But even if the prosecutor misstated the law by telling the jury that J.C. touching himself was "the same thing" as Krahl engaging in lewd fondling, this error does not require reversal of Krahl's conviction. The evidence at trial was quite strong that Krahl did, in fact, touch J.C. in a lewd manner. J.C. clearly stated in his interview at the Sunflower House that Krahl touched his genitals and that it made him feel uncomfortable. The forensic interview was played to the jury and introduced as an exhibit at trial. Moreover, I.C. testified at trial that Krahl touched both his and J.C.'s genitals in the bedroom on May 13, 2013. Krahl also admitted to Krystal that he touched the genitals of both boys, but he stated that it was for sexual education purposes. Finally, Nancy testified that Krahl admitted to touching the genitals of both boys because he believed they were at risk for testicular cancer. Thus, any misstatement by the prosecutor on this point was harmless error and did not affect the outcome of the trial in light of the entire record.

*Inflaming the passions of the jury*

Krahl argues that the prosecutor erred by inflaming the passions of the jury by arguing about what Krahl allegedly said would occur the next time he saw I.C. and J.C.

27

According to Krahl, this statement of possible future conduct distracted the jury from determining whether I.C. and J.C.'s accounts were accurate and instead "allow[ed] the jury to convict in order to prevent a future crime from occurring." The State, in turn, argues that the prosecutor was merely recounting evidence presented in the case that was relevant to rebut Krahl's defense that he was engaging in sex education.

During closing argument, the prosecutor told the jury:

"And so we can be in no doubt as to what he intended to do with his grandsons next time. He performed oral sex on his own son at the age of 11. He was prepubescent, same body shape, same body style, just like [I.C.] and [J.C.] [were] at the time this happened.

"He tells [I.C.] and [J.C.], next time I'm going to show you how to get a girl pregnant which is ejaculation. Next time I'm going to show you how to have sex with yourself, masturbation, ejaculation."

This statement did not inflame the passions or appeal to the emotions of the jury. The prosecutor merely recited facts that were introduced into evidence during the course of the trial. The prosecutor's comments were closely tied to evidence admitted at trial and were directed at addressing Krahl's intent. The prosecutor did not commit error in making the comments.

*Burden shifting*

Finally, Krahl alleges that the State improperly shifted the burden of proof to the defense when discussing the intent element of the charged crimes. Specifically, in regards to whether Krahl had the requisite sexual intent, the prosecutor argued, "We don't know that he wasn't aroused. [I.C.] said he had the book on his lap the whole time. Those children did not know if he was physically aroused. It's his actions with K.K. that tell you what his intent was, what he meant to do." Krahl argues that this comment improperly

28

shifted the burden of proof to the defense and "implied that Mr. Krahl should have come forward with evidence showing he was not aroused." The State argues that this comment did not shift the burden of proof and merely explained that the State could prove Krahl's sexual intent without having to prove actual arousal.

We agree with the State. The prosecutor did not shift the burden of proof to Krahl on the element of intent to commit the crime of aggravated indecent liberties with a child. Instead, the State was explaining to the jury that it did not matter whether Krahl was actually aroused because actual arousal is not required to show the requisite intent for aggravated indecent liberties with a child; that intent—as the State pointed out—can be proven by circumstantial evidence. The State's comment did not constitute prosecutorial error as it did not shift the burden of proof to Krahl.

CUMULATIVE ERROR

Finally, Krahl argues that cumulative error warrants reversal of his convictions. The State first argues that there was no error here, so the cumulative error doctrine cannot apply. Secondly, the State asserts that even if there was any error, it was harmless even when considered collectively because the evidence against Krahl was overwhelming.

Though any one single error may not warrant reversal of a conviction, those errors when considered collectively may be so serious as to merit reversal. *State v. Blanchette*, 35 Kan. App. 2d 686, 708, 134 P.3d 19, *rev. denied* 282 Kan. 792 (2006). "The reversibility test for cumulative error is '"whether the totality of circumstances substantially prejudiced the defendant and denied the defendant a fair trial. No prejudicial error may be found under this cumulative effect rule, however, if the evidence is overwhelming against the defendant."' [Citations omitted.]" *State v. Williams*, 299 Kan. 1039, 1050, 329 P.3d 420 (2014). The doctrine does not apply if there is no error or only one error supporting reversal. *State v. Dixon*, 289 Kan. 46, 71, 209 P.3d 675 (2009).

29

Krahl is not entitled to reversal of his convictions based on cumulative error. The only possible errors we have identified were the prosecutor's comments about Krahl's grooming behavior and the prosecutor's misstatement about J.C. touching himself. But these errors, even when considered collectively, did not deprive Krahl of a fair trial. I.C. and J.C. presented consistent statements of what Krahl did to them and these statements were corroborated by K.K.'s testimony about his own sexual abuse at the hands of Krahl. "'A defendant is entitled to a fair trial but not a perfect one, for there are no perfect trials. [Citations omitted.]'" *State v. Lumley*, 266 Kan. 939, 962, 976 P.2d 486 (1999). Krahl received a fair trial and the evidence supporting his guilt was overwhelming.

Affirmed.