NOT DESIGNATED FOR PUBLICATION

No. 121,947

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Matter of the Care and Treatment of ROBERT DAVIS JR.

MEMORANDUM OPINION

Appeal from Sedgwick District Court; ROBB W. RUMSEY, judge. Opinion filed September 18, 2020. Affirmed.

*Kristen B. Patty*, of Wichita, for appellant.

*Michael J. Duenes*, assistant solicitor general, and *Derek Schmidt*, attorney general, for appellee.

Before SCHROEDER, P.J., GREEN and BUSER, JJ.

PER CURIAM: Following a jury trial, the trial court committed Davis to the custody of the Kansas Department for Aging and Disability Services (KDADS) for treatment within KDADS's sexual predator treatment program. Davis now appeals his commitment, arguing that the State's attorney made a prejudicial comment during his trial. And, thus, he argues that he is entitled to a new trial. We disagree. We conclude that Davis' argument is unpersuasive. As a result, we affirm his commitment to KDADS.

*Background*

In March 2009, Davis texted a 15-year-old girl that "he was looking for single girls for sex." When Davis sent this text, he was 29 years old. Also, when Davis sent this text, he was serving parole for his prior aggravated sexual battery conviction. Based on the preceding, the State charged Davis with electronic solicitation, a severity level 3

1

person felony in violation of K.S.A. 21-3523(a)(1) (now K.S.A. 2019 Supp. 21-5509). Eventually, Davis pleaded guilty to this charge, and the trial court sentenced Davis to 89 months' imprisonment followed by 36 months' postrelease supervision.

In December 2015, the State petitioned the trial court to commit Davis to KDADS's custody on the approaching of his pending release from prison. The Kansas Sexual Violent Predator Act (KSVPA) provided that the State may petition the trial court to commit a "sexually violent predator" to KDADS's custody upon that person's prison release for treatment within KDADS's sexually violent predator program. See K.S.A. 2019 Supp. 59-29a04. The KSVPA defines a "sexually violent predator" as "any person who has been convicted of or charged with a sexually violent offense and who suffers from a mental abnormality or personality disorder which makes the person likely to engage in repeat acts of sexual violence and who has serious difficulty in controlling such person's dangerous behavior." K.S.A. 2019 Supp. 59-29a02(a). The State requested that the trial court commit Davis to KDADS's custody for treatment because he met the statutory definition of a "sexually violent predator" under the KSVPA.

Davis asked the trial court to deny the State's petition. In doing so, Davis agreed that he had previously committed sexually violent offenses. And he agreed that he continued to suffer from a mental abnormality. Nevertheless, Davis challenged the State's assertion that he would likely engage in repeat acts of sexual violence in the future based on his ongoing mental abnormalities.

In November 2016, the trial court held a probable cause hearing on the State's petition. Because it found probable cause to believe that Davis constituted a sexually violent predator under the KSVPA, the trial court set Davis' case for a final determination before a jury.

At his December 2018 jury trial, two psychologists who had conducted forensic evaluations of Davis testified on the State's behalf. Both Dr. Mitchell Flesher and Dr. Derek Grimmell testified about Davis' Static-99R test results. The Static-99R test evaluated the likelihood that a person who has previously committed a sexually violent offense will engage in future acts of sexual violence. Both doctors agreed that Davis scored a six on the Static-99R test, which meant that Davis was four times more likely than the average sex offender to reoffend.

Also, Dr. Flesher opined (1) that Davis suffered from Bipolar II disorder and (2) that his Bipolar II disorder coupled with his sexually violent predisposition made him a danger to the public. Dr. Grimmell agreed that Davis suffered from Bipolar disorder, but he concluded that Davis suffered from Bipolar I disorder; this was a type of bipolar disorder involving more psychotic episodes than Bipolar II disorder. Dr. Grimmell also testified that based on Davis' previous admission of sexual attraction to females age 8 to 18, Davis suffered from pedophilic disorder.

Davis, who represented himself at trial, presented the testimony of Dr. Marc Quillen. Dr. Quillen, who was a behavioral psychologist, opined that Davis suffered from Bipolar II disorder, paranoid personality disorder, and opioid use disorder. He concluded that Davis' past behavior problems stemmed from those disorders, not pedophilic disorder. Dr. Quillen explained that because he believed that Davis did not suffer from pedophilic disorder, Davis was not a "sexually violent predator" under the KSVPA.

Yet, the jury disagreed with Dr. Quillen's testimony, finding that Davis was "a sexually violent predator subject to involuntary commitment." In turn, the trial court committed Davis to KDADS's custody for treatment within KDADS's sexually violent treatment program.

Davis has timely appealed the jury's finding.

3

*Analysis*

Davis' sole argument on appeal involves the State's attorney's use of the term "golden standard" when cross-examining Dr. Quillen about the Static-99R test. The disputed exchange between the State's attorney and Dr. Quillen consisted of the following:

> "[State's Attorney]: And you agree with them that the Static-99R is the golden standard in evaluating risk of individuals for evaluation of whether or not they're at risk for sexually offending in a sexually violent predator case? That was a mouthful. I'm going to reword it.
> "[Dr. Quillen]: Okay.
> "[State's Attorney]: You'd agree with me that the Static 99-R is the golden standard when assessing risk in a sexually violent predator evaluation to start with?
> "[Dr. Quillen]: It is a strong contributor, not just to sexually violent predators, but to sexual offending in general. It was not developed to look at sexually violent predators. That's my only hesitation in your answer. It was really developed to look at sexual offending behavior in general, but it is the gold standard for assessing sexual offending behavior."

Davis contends that the State's attorney's reference to the Static-99R test as the "golden standard" for evaluating sex offender recidivism probability rates is comparable to a prosecutor's prejudicial comment in *State v. Akins*, 298 Kan. 592, 600-01, 315 P.3d 868 (2014). There, our Supreme Court determined that the prosecutor's reference to the "Finding Words" protocol for interviewing children in cases of suspected child abuse as the "gold standard" was held to be reversible error. 298 Kan. 592, Syl. ¶ 9.

But Davis concedes that he did not object to the State's attorney's reference to the Static-99R test as the "golden standard" during his trial. And he notes that K.S.A. 60-404 required him to lodge a specific and contemporaneous objection to any evidentiary error.

Even so, citing two exceptions to the general rule that a new legal theory may not be asserted for the first time on appeal, Davis argues that his "failure to raise this issue before the trial court need not be fatal." First, Davis invokes the exception allowing appellate courts to consider an argument for the first time on appeal because the new argument involves only a question of law arising on proved or admitted facts that are finally determinative of the case. Second, Davis invokes the exception allowing appellate courts to consider an argument for the first time on appeal because consideration is necessary to serve the ends of justice and prevent the denial of fundamental rights. See *In re Estate of Broderick*, 286 Kan. 1071, 1082, 191 P.3d 284 (2008).

The State counters that Davis' failure to lodge a specific and contemporaneous objection to the State's attorney's reference to the Static-99R test as the "golden standard" is fatal. In making this argument, the State contends that our Supreme Court's decisions in *State v. Solis*, 305 Kan. 55, 62-63, 378 P.3d 532 (2016), and *State v. Richmond*, 289 Kan. 419, 428, 212 P.3d 165 (2009), establish that parties must lodge specific and contemporaneous objections to any alleged evidentiary errors to preserve arguments regarding those alleged evidentiary errors for appeal.

In *Solis*, our Supreme Court held that a party cannot circumvent K.S.A. 60-404's plain language—requiring a specific and contemporaneous objection to evidentiary errors—by relying on the caselaw exception that appellate courts may consider an argument for the first time on appeal when consideration of such argument is necessary to serve the ends of justice. 305 Kan. at 63. In *Richmond*, our Supreme Court held that a party cannot circumvent K.S.A. 60-404's plain language requiring a specific and contemporaneous objection to evidentiary errors by relying on the exception that appellate courts may consider an argument raised for the first time on appeal—when the new argument involves only a question of law arising on proved or admitted facts—that is finally determinative of the case. Our Supreme Court reached this holding because

5

"[a]t a minimum, the magnitude of any evidentiary error would still have to be determined by reviewing all other evidence under either the state standard [or] the federal standard [on harmless error]." 289 Kan. at 429.

Under our Supreme Court's holdings in *Solis* and *Richmond*, we cannot review Davis' argument to the extent it involves an evidentiary error. Still, the State's preservation argument ignores that in his brief, Davis has framed his appellate argument as both an evidentiary error and an attorney comment error. Significantly, in *Richmond*, our Supreme Court held that it would "continue to review, without trial objection, non-evidentiary-based claims of prosecutorial misconduct, for example, comments to a jury during voir dire. [Citation omitted.]" 289 Kan. at 429. In sum, because (1) Davis alleged attorney comment error in his brief and (2) our Supreme Court's holding in *Richmond* directs us to consider alleged attorney comment errors when raised for the first time on appeal, we will review Davis' argument to the extent it involves attorney comment error.

It is a well-known rule that attorneys are granted great latitude when making arguments at trial. Our Supreme Court has "consistently followed the general rule against imposing narrow and unreasonable limitations upon argument of counsel made to the jury." *Castleberry v. DeBrot*, 308 Kan. 791, 807, 424 P.3d 495 (2018). Nevertheless, "if counsel injects error into the trial by exceeding that latitude, a court must determine whether that error prejudiced a party's right to a fair trial." 308 Kan. at 807. When an attorney commits error, we must reverse if there is a reasonable probability that the error affected the outcome of the trial in the light of the entire record. 308 Kan. at 807.

Once again, Davis compares his case to the *Akins* case. In *Akins*, while cross-examining a defense expert, the prosecutor asked the expert whether she was aware that the Finding Words protocol was the "gold standard" for interviewing children in cases of suspected child abuse. When the defense expert answered that she was not aware of this, the prosecutor cited an appellate opinion as evidence that the Finding Words protocol

was the gold standard for interviewing suspected child abuse victims. 298 Kan. at 600-01. After the jury convicted him of child sex crimes, Akins appealed to our Supreme Court; Akins argued that the prosecutor's "gold standard" comment constituted reversible prosecutorial error. 298 Kan. at 601.

Our Supreme Court agreed. It first held that the prosecutor committed error by making the "gold standard" comment for the following reasons: (1) the prosecutor had commented on facts not in evidence because nobody had testified that the Finding Words protocol was the "gold standard"; (2) the prosecutor indicated to the jury that the Finding Words protocol was the judicially approved "gold standard" by citing to an appellate opinion; (3) the prosecutor indicated to the jury that she was an expert on Finding Words protocol by citing to an appellate opinion; and (4) the prosecutor relied on language from the appellate opinion's concurrence, meaning no majority appellate court had held that the Finding Words protocol was the "gold standard." 298 Kan. at 601-02. Our Supreme Court then held that the prosecutor's comment constituted reversible error because it bolstered the complaining witness' testimony while undermining the defense expert's testimony. 298 Kan. at 613.

Here, Davis contends that "*Akins* drew a bright line rule indicating that an attorney commits reversible error by referring to a particular protocol or method as the 'gold standard.'" Also, he contends that the State's attorney's comment that the Static-99R test constituted the "golden standard" had a similar effect on the jury as the prosecutor's "gold standard" comment in *Akins*. Specifically, he asserts that the State's attorney "referred to facts that were never in evidence, implied that the Static-99R [was] conclusively unassailable, and suggested that, unlike defense expert Quillen, she [was] an authority on the Static-99R and capable of diagnosing [him] as a sexually violent predator."

The State counters that Davis' case is distinguishable from *Akins*. The State contends that its attorney did not commit comment error by referring to the Static-99R

test as the "golden standard" for evaluating sex offender recidivism probability rates because the trial evidence already established this fact. Also, the State counters that even if its attorney committed comment error, this error was harmless because ample trial evidence supported that Davis constituted a "sexually violent offender" under the KSVPA.

The State's arguments are persuasive. In short, Davis has mischaracterized the State's attorney's reference to the Static-99R test as the "golden standard." A review of the State's attorney's reference shows that such reference was not comparable to the prosecutor's reference to the Finding Words protocol as the "gold standard" in *Akins*.

To begin with, despite Davis' contention to the contrary, *Akins* did not create a bright-line rule against attorneys calling a particular protocol or method a "gold standard." Simply put, our Supreme Court determined that the prosecutor's comment was error based on the particular facts of the *Akins* case. 298 Kan. at 613. Thus, the *Akins* case does not conclusively establish that the State's attorney's disputed comment was error.

Next, the State's attorney did not refer to facts not in evidence when asking Dr. Quillen whether he was aware that the Static-99R test was the "golden standard" for evaluating sex offender recidivism probability rates. To review, the State's attorney initially asked Dr. Quillen whether he "agree[d] with *them* that the Static-99R is the golden standard . . ." (Emphasis added.) She then rephrased her question, asking Dr. Quillen whether he would "agree with [her] that the Static 99-R is the golden standard . . . ." Although the State's attorney rephrased her question, the original wording of the State's attorney's original question shows that someone else, that is, "them," had previously testified about the Static-99R test's reliability.

Indeed, both Dr. Flesher and Dr. Grimmell testified about the Static-99R test's reliability at length. Dr. Flesher testified that the Static-99R test was an actuarial tool. He

8

explained that the test was scientifically reliable in assessing recidivism probability rates of sexual offenders because the Static-99R test had undergone peer review testing within the scientific community. Dr. Flesher further testified that the Static-99R test was the most widely used tool in assessing the recidivism probability rates of sexually violent individuals. Dr. Grimmell agreed with Dr. Flesher, testifying that the Static-99R test had "been put through more than 100 trials" and "has a known reliability." In fact, Dr. Grimmell explained that the Static-99R test was "widely accepted and generally accepted by the healthcare community in evaluating whether an individual meets the criteria of a sexually violent predator."

Our Supreme Court has consistently held that attorneys may draw reasonable inferences from the evidence when making arguments before a jury. See *State v. Thurber*, 308 Kan. 140, 162, 420 P.3d 389 (2018). Here, it is readily apparent that when the State's attorney questioned Dr. Quillen about whether he was aware the Static-99R test was the "golden standard," the State's attorney made an inference that the Static-99R test was the "golden standard" based on Dr. Flesher's and Dr. Grimmell's testimony. Although neither Dr. Flesher nor Dr. Grimmell explicitly referred the Static-99R test as the "golden standard" for sexual offender recidivism probability rates, they implied it was the gold standard based on their testimony.

So the State's attorney made a reasonable inference from the expert testimonial evidence that the Static-99R test was the "golden standard" for evaluating sexual offender recidivism. This expert testimonial evidence clearly distinguishes Davis' case from the *Akins* case. And it undermines Davis' assertion that the State's attorney referred to facts not in evidence.

Also, the State's attorney never suggested that she was an expert on Static-99R tests in the same way that the prosecutor in *Akins* asserted that she was an expert on Finding Words protocol. Again, our Supreme Court's primary complaint about the

9

prosecutor's comment in *Akins* was that the prosecutor suggested that an appellate opinion supported her proposition that the Finding Words protocol was the "gold standard." Our Supreme Court determined that it was the prosecutor's citation to the appellate opinion to support her "gold standard" comment that made the prosecutor seem as an authority on the Finding Words protocol. According to our Supreme Court, it was the prosecutor's false authority that undermined the defense expert's testimony. 298 Kan. at 602.

In Davis' case, however, the State's attorney never cited any caselaw to support her reference to the Static-99R test as the "golden standard." Instead, as addressed in the preceding paragraphs, she made a reasonable inference that the Static-99R test constituted the "golden standard" for evaluating sex offender recidivism probability rates based on Dr. Flesher's and Dr. Grimmell's testimony.

This distinction entirely undermines Davis' contention that the State's attorney acted as an authority on Static-99R tests. Furthermore, it undermines Davis' contention that the State's attorney somehow implied that she knew more about the Static-99R test than Dr. Quillen. Besides, at Davis' trial, Dr. Quillen explained that he believed that Static-99R test results should be considered when determining whether someone constitutes a "sexually violent predator." He merely qualified that he was hesitant to say that a person's Static-99R test definitely established whether a person is a "sexually violent offender" under the KSVPA because the test was "developed to look at sexually offending behavior in general." And perhaps most importantly, Dr. Quillen agreed that the Static-99R test was "*the gold standard for assessing sexual offending behavior*." (Emphasis added.)

As for Davis' argument that the State's attorney implied that the Static-99R test was capable of diagnosing him as a "sexually violent predator," Davis' argument ignores that the only fact issue at his trial was whether he would likely commit repeat acts of

10

sexual violence in the future based on his mental abnormality. Once again, under the KSVPA, a "sexually violent predator" is "any person who has been convicted of or charged with a sexually violent offense and who suffers from a mental abnormality or personality disorder which makes the person likely to engage in repeat acts of sexual violence and who has serious difficulty in controlling such person's dangerous behavior." K.S.A. 2019 Supp. 59-29a02(a). And once again, before the trial court, Davis never contested his criminal history or his ongoing mental abnormalities. Instead, he merely argued that his mental abnormalities did not render him likely to commit repeat acts of sexual violence in the future. So the only fact issue in dispute at Davis' trial was whether his ongoing mental abnormality made him likely to reoffend in the future.

Dr. Flesher and Dr. Grimmell explicitly testified that the Static-99R test evaluated a sexual offender's likelihood to commit repeat acts of sexual violence in the future. So in Davis' case, where the only fact issue concerned his likelihood to reoffend, the Static-99R test was a significant diagnostic tool in determining whether Davis constituted a "sexually violent predator" as meant under the KSVPA.

In summary, Davis has mischaracterized the State's attorney's reference to the Static-99R test as the "golden standard." *Akins* does not create a bright-line rule against calling any diagnostic tool the "gold standard" or the "golden standard." Also, the State's attorney's "golden standard" comment in this case was not comparable to the highly prejudicial comment made by the prosecutor in *Akins*. Instead, the State's attorney's comment that the Static-99R test was the "golden standard" for testing sex offender recidivism probability rates was based on Dr. Flesher's and Dr. Grimmell's testimony. For those reasons, we hold that the State's attorney did not commit attorney comment error, and we affirm Davis' commitment to KDADS's custody for treatment within the sexual predator treatment program.

11

Finally, we note that the evidence supporting Davis' "sexual violent predator" status was overwhelming. Davis' criminal history includes committing electronic solicitation of a minor while on parole for aggravated sexual battery. Also, Davis' handwritten therapy notes, which the State admitted at trial, established the following: (1) that Davis engaged in sexual contact with multiple minors when not in prison, (2) that Davis recognized he struggled with "manag[ing his] attraction to females aged 10-17," and (3) that about a year before his trial, Davis admitted he constituted a sexually violent predator." Based on the preceding evidence, as well as the fact that the trial court instructed the jury that attorney comments were not evidence, we conclude that even if the State's attorney committed comment error with her "golden standard" reference, the comment error was harmless because there is no reasonable probability that the comment affected the jury's finding that Davis constituted a "sexually violent predator" under the KSVPA.

Affirmed.